In re XONICS, INC., Xonics Medical Systems, Inc., Xonics Imaging, Inc., Xonics Photochemical, Inc., Ekoline, Inc., Standard X-Ray Company, Medical Equipment Manufacturing Co., Inc., and Radiographic Development Corporation, Debtors.

Bankruptcy No. 84 B 2101–2108.

United States Bankruptcy Court, N.D. Illinois, E.D.

Aug. 7, 1986.

Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for debtors.

Robert Boehm & Associates, Ltd., Chicago, Ill., for Barrington Industrial Associates.

MEMORANDUM OPINION
AND ORDER

EDWARD B. TOLES, Bankruptcy Judge.

This cause coming on to be heard upon the Application for Payment of Use and Occupancy as an Administrative Expense filed by BARRINGTON INDUSTRIAL AS-SOCIATES [Barrington], represented by ROBERT BOEHM & ASSOCIATES, LTD., and upon the Response thereto filed by MEDICAL EQUIPMENT MANUFACTUR-ING CO., INC., one of the Debtors in these Chapter 11 cases, represented by KAT-TEN, MUCHIN, ZAVIS, PEARL & GAL-LER, and the Court, having considered the record in this case and the pleadings on file, and having examined the Memoranda of Law filed by the parties in support of their respective positions, and having afforded the parties an opportunity for hearing, and being fully advised in the premises;

The Court Finds:

1. On February 17, 1984, MEDICAL EQUIPMENT MANUFACTURING CO., INC. [Debtor], XONICS, INC., its parent, and six of its affiliates [collectively, the "Xonics Group"], each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since that time, Debtor and each of the other members of the Xonics Group have continued to operate their businesses and manage their properties as Debtors-in-Possession.

2. On August 28, 1985, the Court confirmed Debtors' Chapter 11 Plan of Reorganization. Pursuant to the Plan, the estates of the Xonics Group were substantively consolidated. The claim asserted by Barrington in this cause against the estate of Debtor constitutes a claim asserted against the consolidated estate of the Xonics Group.

3. Prior to the commencement of this case, Debtor entered into a lease, dated May 7, 1975 and amended on January 16, 1976, for approximately 50,000 square feet of commercial property commonly known as 2495 West Pembroke Avenue, Hoffman Estates, Illinois [the Premises]. The lessor of the Premises was LaSalle National Bank, as Trustee under Trust No.. 47804. Barrington, an Illinois general partnership, was the beneficiary of the Land Trust.

4. The Premises was leased by Debtor for the purpose of offices, light manufacturing, or other use permissible under the applicable zoning classification. The lease was for a term of ten years from January, 1976. Debtor paid an annual net rent for the Premises of $90,074.50 (approximately $1.81 per square foot for approximately 50,000 square feet). The lease also provided for payment by Debtor of real estate taxes attributable to the Premises as additional rent.

5. On June 21, 1984, Debtor rejected the lease pursuant to a Court Order. On July 22, 1984, Debtor vacated the Premises.

6. On May 28, 1985, Barrington filed an application for payment of use and occupancy as an administrative expense under Section 503(a) and 503(b)(1)(A) of the Bankruptcy Code. 11 U.S.C. § 503. Barrington seeks recovery of $91,432.38 for use and occupancy of the Premises for outstanding rental charges equal to the fair market value of the Premises from February 17, 1984, the date Debtor filed its Chapter 11 petition, to July 22, 1984, the date Debtor vacated the Premises, plus the pro rata portion of the real estate taxes for Debtor's period of occupancy. Barrington's $91,432.38 claim is comprised of $64,109.59 in base rent for such period at the rate of $3.00 per square foot, and $27,322.99 in real estate taxes prorated for such period.

7. On June 19, 1985, Debtor filed a Response. In that Response, Debtor contends that Barrington's $91,432.38 claim should be denied because the use and occupancy of the Premises provided no benefit to Debtor or to the Xonics Group in the operation of their various businesses. In the alternative, Debtor argues that Barrington's claim for an administrative expense should be limited to the amount provided by the lease. Under the lease agreement, the base rent for the period between

February 17, 1984 and July 22, 1984 would be $33,130.00.

8. On December 5, 1985, a trial was held on this matter before this Court. Mr. Romeo Mura testified as an expert witness on Barrington's behalf. Mr. Mura is a Senior Associate with the firm of Bennett & Kahnweiler Associates. Mr. Mura has a Bachelor's Degree as well as a Master's Degree in Civil Engineering. He also is a real estate broker licensed by the State of Illinois in 1980. Mr. Mura specializes in industrial and commercial real estate. Since 1980, he has had $32 million in sales for his real estate firm. The northwest suburbs of Chicago is the geographical area where Mr. Mura does most of his business. The Premises is located in Hoffman Estates, Illinois, which is a northwest suburb of Chicago.

9. Mr. Mura testified to the following: that the Premises was approximately ten years old, it was in excellent condition, and it was conveniently located near an expressway; the Premises had a high percentage of office space, it had ample parking spaces (a total of 44), and it was a well-insulated building and, thus, energy and cost efficient. On August 1, 1984, Mr. Mura was the listing agent for the Premises and he had shown it to a prospective client.

10. Mr. Mura further testified as to the rental values of three other comparable properties which were located within a ten-to-twenty minute drive from the Premises. Exhibit A, which was introduced into evidence, is a reduced-scale map of the northwest suburbs of Chicago. Indicated on that map are the locations of the three comparable properties in relation to the Premises. Two of these properties are located in Elk Grove Village, Illinois, and the other is located in Schaumberg, Illinois. Mr. Mura stated that he had shown these comparable properties to various prospective clients. The listing sheets for these comparable properties were admitted into evidence and marked Exhibits B, C and D.

11. Mr. Mura stated that in 1984 these similar properties leased from $3.00 to $3.50 per square foot. It was Mr. Mura's opinion that the fair market rental value of the Premises for the period from February 17, 1984 through July 22, 1984 was $3.00 to $3.25 per square foot.

12. Mr. Mura testified that in June of 1984, he visited the Premises which was then occupied by Debtor, and he observed that there were eight to ten people conducting a small office operation. He also recalled seeing equipment on the Premises that was apparently being stored.

13. Mr. Sidney Kulek testified on behalf of Debtor. Mr. Kulek was the President and Chief Executive Officer of Xonics, Inc. throughout the period in question. He was also an officer and a member of the Board of Directors of each of the members of the Xonics Group, including Debtor. Mr. Kulek was the person designated by the Court as the person responsible for the operation of the Xonics Group as Debtors-in-Possession.

14. Mr. Kulek testified to the following: Xonics, Inc. acquired Debtor in 1973. At that time, Debtor manufactured special procedure X-ray tables and high-speed film changes. In 1978, Debtor's manufacturing operations were moved from the Premises and were consolidated with one of the other subsidiaries in the Xonics Group. Since 1978, the Premises was used primarily as a warehouse to store assets owned by Debtor, and these assets were subject to the liens of secured creditors. A year prior to the bankruptcy, Debtor made attempts to sublet the Premises for $1.50 per square foot but was unsuccessful.

15. When asked about the equipment on the Premises, Mr. Kulek stated: "primarily work in progress that was used in the manufacture of Xonics Medical Systems Equipment, some obsolete Memco and Standard equipment, corporate records that we had stored there and also corporate literature." When questioned as to the number of persons on the Premises, Mr. Kulek stated: "It would be hard to determine. For instance, when you're attempting to move the equipment out ... there could have been ten or twelve people there.

At other times there might have been one or two people researching various records that were stored there." Mr. Kulek further stated that the telephones were connected and operating through July 22, 1985 which was the date Debtor vacated the Premises.

16. The parties stipulated to the fact that pursuant to the Lease, Debtor was obligated to pay real estate taxes as additional rent to Barrington, and that the 1983 real estate taxes paid by Barrington in 1984 was the sum of $63,928.78.

The Court Concludes and Further Finds:

1. Section 503(b)(1)(A) provides:

(b) After notice and a hearing, there shall be allowed administrative expenses, ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate ... 11 U.S.C. § 503.

2. The Seventh Circuit recently held that "a claim will be afforded priority under Section 503 if the debt both (1) arises from a transaction with the debtor-in-possession, and (2) is beneficial to the debtor-in-possession in the operation of the business." *In re Jartran,* 732 F.2d 584, 587 (7th Cir.1984).

3. In the case at bar, Barrington's claim arose from a transaction with the Debtor-in-Possession because Debtor still occupied the Premises subsequent to the filing of its Chapter 11 petition on February 17, 1984, until it vacated the Premises on July 22, 1984.

4. The Court further observes that Debtor's occupation of the Premises from February 17, 1984 through July 22, 1984 was beneficial to the Debtor-in-Possession in the operation of its business. According to the credible testimony of Mr. Mura, he noticed, during his visit in June of 1984, eight to ten people conducting a small office operation on the Premises. Mr. Mura's testimony was corroborated by Mr. Kulek, an officer and board member of Debtor, who stated that at times, ten or twelve people were on the Premises and that there was "work in progress that was used in the manufacture" of medical equipment. Debtor stored equipment on the Premises which it owned. Corporate records and literature were stored on the Premises which were important enough for Debtor to have on occasion two of its employees researching through them. The evidence presented by both parties indicates that Debtor conducted a portion of its business on the Premises; therefore, Debtor received a benefit from the use of the Premises. Under the guidelines established by the Seventh Circuit in *In re Jartran, supra,* Barrington's claim is entitled to priority as an administrative expense under Section 503 of the Bankruptcy Code. The next task is to determine the amount of Barrington's claim.

5. Two theories have developed with regard to determining claims for administrative rent in bankruptcy proceedings. One theory advanced by the case of *In re United Cigar Stores Company of America,* 69 F.2d 513, 516 (2nd Cir.1934) adheres to the view that reasonable rental value must be based on the value of Debtor's actual use of the property. The other theory advanced by the case of *Kneeland v. American Loan and Trust Company,* 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379 (1890) and long followed by the Seventh Circuit in *In re Millard's, Inc.,* 41 F.2d 498 (7th Cir.1930) subscribes to the view that administrative rent claims must be based upon the reasonable rental value of the property regardless of the use made of the property. *See In re Schnabel,* 612 F.2d 315 (7th Cir.1980); *In re International Storage Corporation,* 41 B.R. 808 (Bankr. E.D.Wis.1984).

6. Debtor suggests that this Court follow the view that reasonable rental value should be based on the value of Debtor's actual use of the property. This we will not do. This Court shall adopt the view long followed by the Seventh Circuit that administrative rent claims must be based upon the reasonable rental value of the property regardless of the use made of the property.

7. There is a presumption that the reasonable rental value of the property is equivalent to the amount of rent fixed in the lease. *In re Schnabel, supra,* at 318; *In re Gourmet Gallery, Inc.,* 27 B.R. 912, 915 (Bankr.E.D.Pa.1983). This presumption, however, can be rebutted by convincing, contradictory evidence. *In re Schnabel, supra,* at 318; *In re GHR Energy Corp.,* 41 B.R. 668, 672 (Bankr.D.Mass.1984). This rebutting evidence may point toward an amount which is less than the amount fixed in the lease, *In re Schnabel, supra,* at 318, or it may point toward an amount which is greater than the amount fixed by the lease. *Don Allen Chevrolet, Inc. v. Foreman* (*In re First Research Corporation*), 457 F.2d 331 (5th Cir.1972). In any event, the analysis should only center around the reasonable rental value of the property as established either by the lease rate or by the rate established by the rebutting evidence presented by a party.[1] If it is determined that the reasonable rental value of a property is greater than the lease rate, it would be unfitting for a debtor to complain since "a debtor has it within his power to minimize the costs of administration by acting promptly" by either rejecting or assuming the lease. *In re Fred Sanders Company,* 22 B.R. 902, 907 (Bankr.E.D.Mich.1982).

8. In the case at bar, the lease rate for the Premises was set at $1.81 per square foot. This $1.81 lease rate was determined in 1975. Barrington has offered the testimony of Mr. Mura, who in this Court's opinion qualifies as an expert in commercial real estate because of his knowledge, experience and educational background. Furthermore, Mr. Mura was quite familiar with the Premises since he had shown it to a prospective client. Also, he was well familiar with three similar properties located near the Premises, and these properties leased from $3.00 to $3.50 per square foot in 1984. In Mr. Mura's expert opinion, the fair market rental value of the Premises for the period from February 17, 1984 through July 22, 1984 was $3.00 to $3.25 per square foot.

9. Debtor has not offered any expert testimony to rebut Mr. Mura's testimony as to the fair market rental value of the Premises for the period in question. The Court accords little weight to the testimony of Mr. Kulak regarding Debtor's unsuccessful efforts to sublet the Premises. There is case authority which supports Barrington's effort to use expert testimony to rebut the presumption that the lease rate set in 1975 does not represent the reasonable rental value of the property in 1984.[2]

10. The Court concludes that Barrington has presented clear and convincing evidence to rebut the presumption that the lease rate, which for the period between February 17, 1984 and July 22, 1984 represents a base rent of $33,130.00 at $1.81 per square foot, is reasonable. Barrington has

---

1. On this subject, the Court in *In re Fred Sanders Company,* 22 B.R. 902, 906 (Bankr.E.D.Mich.1982) stated:

> The desire to keep a lid on expenses of administration is laudable, but an estate is not to be maintained for the debtor or creditors at the expense of those who have valid charges against property of the estate.

The Court in *Diversified Services, Inc. v. Harralson* (*In re Allen Industrial Supply Division, Inc.*), 369 F.2d 93, 95 (5th Cir.1966), stated:

> [I]n establishing proper administrative rent, ... the Referee should not consider that the trustee has used only for storage purposes property that had been occupied by a going business.... Nor can the appropriate rent be limited by the amount that the Referee feels the estate can "afford to pay"—to do so would be to confer on general creditors an advantage obtained after bankruptcy at the expense of the landowner.

2. Based on the expert testimony of claimant's witness, the Fifth Circuit, in the case of *In re First Research Corporation, supra,* found that the value of the property had increased such that the 1966 lease rate of $2,685.18 per month did not represent the reasonable rental value of the property in 1971. The unrebutted testimony of claimant's expert established a lease rate of $4.75 a square foot, or $3,600.00 per month, for the months subsequent to February 9, 1971, and the Fifth Circuit upheld the District Court's finding that this amount was the reasonable rental value of the property, and the claimant was allowed this amount as an administrative expense.

also presented clear and convincing, unre-butted expert testimony establishing the reasonable rental value for the Premises from February 17, 1984 through July 22, 1984 to be $3.00 per square foot which represents a base rent of $64,109.59 for the period.

11. Pursuant to the facts stipulated by the parties, Barrington is entitled to $27,322.79 from Debtor as additional rent which sum represents the pro rata share of the 1983 real estate taxes, $63,928.78, paid by Barrington in 1984.

12. Under Section 503 of the Bankruptcy Code, Barrington is entitled to administrative rent from Debtor in the amount of $91,432.38, which sum represents Debtor's use and occupancy of the Premises from February 17, 1984 through July 22, 1984. 11 U.S.C. § 503. This administrative rent, in the sum of $91,432.38, is entitled to first priority under Section 507(a)(1) of the Bankruptcy Code. 11 U.S.C. § 507(a)(1).

13. This cause constitutes a core proceeding. 28 U.S.C. § 157.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Application for Payment of Use and Occupancy as an Administrative Expense filed by BARRINGTON INDUSTRIAL ASSOCIATES be, and the same is hereby granted;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that MEDICAL EQUIPMENT MANUFACTURING CO., INC., one of the Debtors in these Chapter 11 cases, is directed to pay to BARRINGTON INDUSTRIAL ASSOCIATES the sum of $91,432.38, which sum represents Debtor's use and occupancy of the Premises from February 17, 1984 through July 22, 1984 in the amount of $64,109.59 as base rent, and $27,322.79 as Debtor's pro rata share of the real estate taxes, and this $91,432.38 sum is an administrative expense under Section 503 of the Bankruptcy Code which is entitled to first priority under Section 507(a)(1) of the Bankruptcy Code. 11 U.S.C. §§ 503, 507.