GOODWIN, Circuit Judge:
 

 Burlington Northern Railroad Company appeals from the district court order denying its claim for administrative expense priority against the bankruptcy estate of Dant & Russell, Inc. We affirm in part and reverse in part and remand for further proceedings.
 

 Dant & Russell, Inc. (debtor-in-possession), operated a wood treatment plant and storage facilities on two parcels of land
 
 *702
 
 from 1972 to December 1983. Logs were stored on one parcel, the Vadis site, and then treated with creosote and other chemicals at the North Plains site.
 

 Debtor-in-possession owned most of the land at each site. A portion of the land at each site, however, is owned by Burlington Northern and is leased to debtor-in-possession.
 

 On November 22, 1982, debtor-in-possession filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. On March 1, 1983, debtor-in-possession’s president executed new leases with Burlington Northern for the North Plains and Vadis sites. Burlington Northern knew that debtor-in-possession had filed under Chapter 11, and therefore insisted on short-term, five-year leases instead of the previous fifteen-year leases. For more than a year after filing the petition, debtor-in-possession continued to operate the sites. Debtor-in-possession did not cease operations at the Northern Plains site until December of 1983. That site was used only for treatment of remaining inventory to facilitate liquidation.
 

 Debtor-in-possession entered into new leases, postpetition, without consulting bankruptcy counsel or seeking court approval. Debtor-in-possession’s president testified that he failed to seek court approval for the new leases because he believed that the new leases merely extended the existing leases and the status quo.
 

 The leases contain several provisions pertaining to environmental hazards. These provisions are identical in both leases.
 
 [1]
 
 Additionally, paragraph 14 of the leases provides that lessee (debtor-in-possession) agrees to restore the premises to a condition satisfactory to the lessor before abandoning the premises.
 

 Oregon’s Department of Environmental Quality, subsequent to the execution of the postpetition leases, identified both sites as contaminated with creosote, chromium, arsenic, pentachlorophenol, and other hazardous wastes. The cumulative effect of operations by debtor-in-possession’s predecessors-in-interest and its own wood-treatment operations since 1972 was massive toxic waste contamination.
 

 On January 2, 1985, the Department wrote Burlington Northern a letter which stated that debtor-in-possession had failed to respond to requests for on-site investigations, “indicat[ing] that its [debtor-in-possession’s] creditors will not allow expenditures of funds for any environmental investigations or even removal of hazardous wastes stored onsite.” The letter noted that “significant concentrations” of pentachlorophenol were found in the creek and the groundwater near the North Plains site, and that the City of North Plains and North Plains Elementary School draw drinking water from within one-quarter mile of the contaminated property. Burlington Northern notes that a subsequent, unidentified, Environmental Protection Agency (EPA) study also found dioxins at the North Plains site which have been linked to an increased incidence of liver cancer in the area.
 

 Burlington Northern claims to have spent in excess of $250,000 to mitigate the most serious hazards under an agreement with the EPA. No arrangements have been made to clean up the site. With cleanup costs estimated at $10-30 million,
 
 *703
 
 the land has a substantial negative value no matter who ultimately takes possession.
 

 Debtor-in-possession’s unencumbered assets, after satisfaction of secured claims, are estimated at $3 million.
 

 Bankruptcy Court Proceedings
 

 Burlington Northern filed a “Supplemental Proof of Claim” with the bankruptcy court, requesting administrative expense priority for the clean-up costs at the site. Debtor-in-possession contested Burlington Northern’s claim for administrative expense priority, and requested an 11 U.S.C. § 502(c) (1982
 
 &
 
 Supp. IV 1987) estimation of liability. Administrative priority in practical effect would wipe out the claims of all nonpreferred creditors.
 

 The court deferred estimating the claim under 11 U.S.C. § 502(c) (1982 & Supp. IV 1987), but granted debtor-in-possession’s other motions. Further, the court held that the postpetition leases were avoidable under 11 U.S.C. § 549(a) (1982 & Supp. IV 1987), because they were transactions unauthorized by the court or the Bankruptcy Code. The court further found that execution of the postpetition leases was not in the ordinary course of business and without notice or a hearing. The court approved neither the holdover tenancy nor the postpetition leases, and consequently disallowed Burlington Northern’s request for administrative expense priority.
 
 In re Dant & Russell, Inc.,
 
 61 B.R. 668 (Bankr.D.Or.1985), aff'
 
 d,
 
 67 B.R. 360 (D.Or.1986).
 

 District Court Proceedings
 

 Although the district court concluded that the leases were necessary to the debt- or-in-possession’s business operation, it did not consider whether the continued business operation would augment or dissipate the bankruptcy estate. The district court found that the debtor-in-possession was liable for the reasonable amount of rent under the leases during the holdover period, November 22, 1982 to March 1, 1983. It concluded that Burlington Northern’s claim under this finding was a general unsecured claim dating back to the date before debtor-in-possession filed its bankruptcy petition pursuant to 11 U.S.C. § 365(g) (1982 «fe Supp. IV 1987). It determined that these claims were not entitled to administrative expense priority. The district court also found that Burlington Northern would not be entitled to administrative expense priority for its environmental cleanup costs.
 
 In re Dant & Russell, Inc.,
 
 67 B.R. 360 (D.Or.1986).
 

 Avoidability of Postpetition Leases
 

 Burlington Northern argues that the debtor-in-possession’s obligations under the postpetition leases are valid under 11 U.S.C. § 363(b) (1982 «fe Supp. IV 1987) because they were executed in the debtor-in-possession’s ordinary course of business. Consequently, Burlington Northern claims that the postpetition leases may not be avoided under 11 U.S.C. § 549(a) (1982 <& Supp. IV 1987). Debtor-in-possession, on the other hand, asserts that the postpetition leases were void because they were not executed within its ordinary course of business, nor were they executed with notice to creditors and a hearing as required under section 363(b). Debtor-in-possession contends that its liability thereunder is avoidable under section 549(a), which provides in pertinent part:
 

 Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
 

 (1) that occurs after the commencement of the case; and ...
 

 (2)(B) that is
 
 not authorized
 
 under this title or by the court.
 

 11 U.S.C. § 549(a) (1982 «fe Supp. IV 1987) (emphasis added). Although section 549(a) refers to a
 
 trustee’s
 
 powers and rights, 11 U.S.C. § 1107 (1982) provides that a debtor-in-possession
 
 [2]
 
 may be properly regarded as a trustee for section 549(a) purposes.
 
 See Johnston v. First Street Companies, Inc. (In re Waterfront Companies, Inc.),
 
 56 B.R. 31, 34-35 (Bankr.D.Minn.1985) Moreover, under 11 U.S.C. § 1108 (1982), the trustee, or as here, the debtor-in-posses
 
 *704
 
 sion, “may operate the debtor’s business” provided the court does not order otherwise.
 
 Id.
 
 The debtor-in-possession is limited by section 363(b), which directs that “the trustee [or debtor-in-possession], after notice and a hearing,
 
 may
 
 use, sell, or lease, other than in the
 
 ordinary course of business,
 
 property
 
 [3]
 
 of the estate.” 11 U.S.C. § 363(b) (1982 & Supp. IV 1987) (emphasis added) (footnote added). And,
 

 If the business of the debtor is authorized to be operated under section 721, 1108,1304, 1203, or 1204, of this title and unless the court orders otherwise, the trustee [or debtor-in-possession]
 
 may enter into transactions,
 
 including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and
 
 may use property of the estate in the ordinary course of business without notice or a hearing.
 

 11 U.S.C. § 363(c)(1) (1982 & Supp. IV 1987) (emphasis added). Reading subsections (b) and (c)(1) together indicates that the general rule is that unauthorized lease transactions are permissible only to the extent that they are executed in the debt- or’s “ordinary course of business.”
 
 See Waterfront,
 
 56 B.R. at 34. Thus, the dis-positive question becomes, for our purposes, whether the postpetition leases were executed in the ordinary course of debtor-in-possession’s business.
 

 In analyzing this question, we note that neither the Bankruptcy Code nor the legislative history of section 363(e)
 
 [4]
 
 offers guidance as to what constitutes “ordinary course of business;” however, courts interpreting the term have established guidelines which are helpful and persuasive here.
 
 Id.
 
 at 35;
 
 In re Johns-Manville Corp.,
 
 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986),
 
 rev’d on other grounds,
 
 801 F.2d 60 (2d Cir.1986). Two tests emerge to aid in assessing whether the postpetition leases were executed in the ordinary course of business: (1) vertical dimension or creditor’s expectation test and (2) horizontal dimension test.
 

 A.
 
 Horizontal Dimension Test
 

 The horizontal dimension test was first articulated in
 
 Waterfront,
 
 56 B.R. at 34-35, and may be described as involving an industry-wide perspective in which the debtor’s business is compared to other like businesses. In this comparison, the test is whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business.
 
 See id.
 
 at 34;
 
 see also Johns-Manville,
 
 60 B.R. at 618.
 
 [5]
 
 The horizontal dimension test comports with the construction of the term in other code sections, namely that a transaction occurs in the debtor-in-possession’s ordinary course of business when there is a showing that the transaction is the sort occurring in the day-to-day operation of debtor’s business.
 
 Johns-Manville,
 
 60 B.R. at 618. “[T]his showing is required merely to assure that neither the debtor nor the creditor [did] anything abnormal to gain an advantage over other creditors[;] an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally.”
 
 Id.
 
 (emphasis omitted) (quoting
 
 In re Economy Milling Co., Inc.,
 
 37 B.R. 914, 922 (D.S.C.1983)) (interpreting use of the term in 11 U.S.C. § 547(c)(2) (1982)).
 

 The facts here suggest that the horizontal dimension test has been satisfied. Debtor-in-possession operated the wood-treatment facility for eleven years following its execution of the leases with Burling
 
 *705
 
 ton Northern in 1971. It operated on owned land combined with the leased land. Debtor-in-possession’s predecessors executed similar leases and operated in substantially the same manner in the same wood-treatment facility as early as 1958. The debtor-in-possession’s products were in part shipped by rail, and the leased premises provided a rail siding. Debtor-in-possession’s leasing activities recurred over a period of more than 13 years. The execution of the renewal leases obviously did not occur on a day-to-day basis; however, a transaction can be considered as in the ordinary course of business even though it occurs only occasionally. Thus, under the horizontal dimension test analysis and
 
 Economy Milling,
 
 the postpetition renewal leases are properly regarded as within the debtor-in-possession’s ordinary course of business.
 

 B.
 
 Vertical Dimension or Creditor’s Expectation Test
 

 The vertical dimension, or creditor’s expectation test, views the disputed transaction “from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.”
 
 Johns-Manville,
 
 60 B.R. at 616. This test was first articulated in
 
 In re James A. Phillips, Inc.,
 
 29 B.R. at 394. The district court there noted:
 

 [t]he touchstone of “ordinariness” is ... the interested parties’ reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections to such transactions are likely to relate to the bankrupt’s Chapter 11 status, not the particular transactions themselves.
 

 Id.
 
 [6]
 

 The creditor’s expectation test was reformulated as the vertical dimension test in
 
 Waterfront,
 
 56 B.R. at 35. The district court noted that “[sjome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary.” Id.
 
 [7]
 
 Here, the debtor-in-possession’s pre-petition business activities are compared to its postpetition transactions.
 
 See In re DeLuca Distribution Co.,
 
 38 B.R. 588, 594 (Bankr.N.D.Ohio 1984) (finding that it was in the debtor’s ordinary course of business to enter into new, postpetition collective bargaining agreement where it had done so prepetition);
 
 see also In re County Line Homes, Inc.,
 
 43 B.R. 440, 442 (E.D.Mo.1984) (finding that because debtor’s prepet-ition business included the sale of mobile homes, the debtor’s postpetition sale of mobile homes was within debtor’s ordinary course of business).
 

 That leasing transactions had been previously engaged in by debtor-in-possession and Burlington Northern is not in question. Creditors, if asked, would have assumed that an ongoing business would renew the lease on its business premises. The debtor-in-possession’s execution of the postpetition leases therefore satisfies the vertical dimension test. Because both the vertical and horizontal dimension tests have been met, the postpetition leases were executed in the ordinary course of debtor-in-possession’s business for section 549(a) purposes and are not avoidable as being outside the ordinary course. Because the postpetition leases are not an extraordinary business activity of debtor-in-possession, creditors reasonably would have expected it to continue its leasing activities, without requir
 
 *706
 
 ing notice or a hearing.
 
 Johns-Manville,
 
 60 B.R. at 619.
 

 A proper application of persuasive legal authorities requires that the postpetition leases be regarded as within the debtor-in-possession’s ordinary course of business. Consequently, the postpetition leases are valid under section 363(a) and are therefore not avoidable for section 549(a) purposes. Thus, the conclusions of the bankruptcy court on this point are erroneous and cannot be upheld.
 
 In re Camino Real Landscape Maintenance Contractors, Inc.,
 
 818 F.2d 1503, 1505 (9th Cir.1987);
 
 Acequia Inc. v. Clinton (In re Acequia, Inc.),
 
 787 F.2d 1352, 1357-58 (9th Cir.1986).
 

 Contrary to debtor-in-possession’s contention, section 365(a) is inapplicable to leases executed postpetition as that section contemplates a prepetition lease or executory contract which is unexpired on the date of the petition.
 
 See, e.g., NLRB v. Bildisco & Bildisco,
 
 465 U.S. 513, 521-22 & n. 6, 104 S.Ct. 1188, 1193-94 & n. 6, 79 L.Ed.2d 482 (1984) (“[T]he legislative history of § 365(a) indicates that Congress intended [executory contract] to mean a contract ‘on which performance remains due to some extent on both sides.’ ”) (citations omitted);
 
 Hall v. Perry (In re Cochise College Park, Inc.),
 
 703 F.2d 1339, 1348 (9th Cir.1983) (An executory contract [or unexpired lease] is one under which the obligations of the bankrupt and the other party “are so far unperformed [at the moment of filing] that the failure of either to complete performance would constitute a material breach — ”) (citations omitted). Therefore, we next consider the effect of the debtor-in-possession’s inability to avoid under section 549(a).
 

 Administrative Expense Priority under Section 503(b)(1)(A)
 

 Section 503(b)(1)(A) provides as follows:
 

 (b) After notice and a hearing, there shall be allowed, administrative expenses ... including ... the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commission for services rendered after the commencement of the case[.]
 

 The statute is explicit. Any claim for administrative expenses and costs must be the actual and necessary costs of preserving the estate for the benefit of its creditors.
 
 Matter of Baldwin-United Corporation,
 
 43 B.R. 443, 451 (S.D. Ohio 1984). The terms “actual” and “necessary” are construed narrowly so as “to keep fees and administrative costs at a minimum.”
 
 [8]
 

 In re O.P.M. Leasing Services, Inc.,
 
 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982);
 
 see also
 
 3
 
 Collier on Bankruptcy,
 
 11 503.04, at 503-23 (15th ed. 1988). An actual benefit must accrue to an estate.
 
 See In re McKeesport Steel Castings Co. (Equitable Gas Co. v. Equitable N.A.,
 
 799 F.2d 91, 94-95 (3rd Cir.1986)) (postpetiton gas services were properly ordered paid to utility as an administrative expense necessary to preserve going concern value of Chapter 11 debtors estate);
 
 Broadcast Corp. of Georgia v. Broadfoot,
 
 54 B.R. 606, 611 (N.D.Ga.1985) (“The mere potential of benefit to the estate does not satisfy this requirement”). Additionally, keeping costs to a minimum serves the overwhelming concern of the Code: Preservation of the estate.
 
 Otte v. United States,
 
 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974);
 
 see also Randolph v. Scruggs,
 
 190 U.S. 533, 537-39, 23 S.Ct. 710, 712, 47 L.Ed. 1165 (1903). This limitation is necessary to protect the limited assets of the estate for the benefit of the unsecured creditors’ interests and is particularly important in a Chapter 11 case where a partial liquidation is necessary to facilitate reorganization. This portion of the. Chapter 11 case here resembles a Chapter 7 liquidation case and, by analogy:
 

 Since the goal in a Chapter 7 case is to “cash out” the bankrupt entity, rather than continue its operations, Chapter 7 is more concerned with maximizing the size of the estate to be distributed than with
 
 *707
 
 the Chapter 11 goal of inducing third parties to contribute towards the continued operations of the business.
 

 Broadcast,
 
 54 B.R. at 611.
 

 Hence, two factors must be weighed: maintaining the estate in as healthy a form as possible for the benefit of creditors while allowing essential costs of administering an ongoing business venture to be paid up front, thereby giving the debtor its best shot at emerging as a vital concern.
 
 Baldwin-United Corp.,
 
 43 B.R. at 452. Although a claim may meet the implicit requirement of section 503(b)(1)(A), namely that any claims under the section must have a distinct postpetition character, bankruptcy courts have broad discretion in determining whether to award administrative expense priority.
 
 Baldwin-United Corp.,
 
 43 B.R. at 453;
 
 Matter of Hearth & Hinge, Inc.,
 
 28 B.R. 595 (Bankr.S.D.Ohio 1983) (administrative expense priority granted where storage and appraisal of the debtor’s property protected and preserved the major portion of the estate’s assets and thus conferred a benefit upon the debtor and its creditors). That discretion is limited by the clear intent of section 503(b)(1)(A): the actual and necessary costs of preserving the estate.
 
 See Matter of Jartran, Inc.,
 
 732 F.2d 584 at 586 (7th Cir.1984).
 

 Moreover, if the trial court elects to award administrative expense priority, that amount should not exceed the fair and reasonable rental value.
 
 In re Tucci,
 
 47 B.R. 328, 333 (Bankr.E.D.Va.1985). In
 
 In re Thompson (Thompson v. IFG Leasing Co.,
 
 788 F.2d 560, 562 (9th Cir.1986)), we made a similar determination.
 
 Thompson
 
 involved a claim for administrative expense priority for the interim period between filing and the trustee’s decision to reject an unexpired lease. Ordinarily, any claim arising during this interim period would be treated as prepetition, 11 U.S.C. § 365(g) (1982); 2
 
 Collier on Bankruptcy
 
 11365.08 (15th ed. 1986); however, where the “trustee actually uses the leased property, the law is clear that the rent incurred is an allowable administrative expense.”
 
 Id.; In re Cochise College Park, Inc.,
 
 703 F.2d 1339, 1354 (9th Cir.1983).
 

 The amount of the administrative expense claim is limited to the “portion of the leased property” that is actually used or occupied.
 
 Thompson,
 
 788 F.2d at 564. The amount of the administrative expense claim is not valued according to the lease term, but under an objective worth standard that measures the fair and reasonable value of the lease.
 
 Id.
 
 at 563;
 
 Cochise,
 
 703 F.2d at 1354 n. 17;
 
 In re Fredrick Meats, Inc.,
 
 483 F.2d 951, 953 (5th Cir.1972) (per curiam). A presumption exists that the contractual rental rate,
 
 Cochise,
 
 703 F.2d at 1354 n. 17;
 
 Union Leasing Co. v. Peninsula Gunite, Inc. (In re Peninsula Gunite, Inc.)
 
 24 B.R. 593, 595 (9th Cir. BAP 1982); or the amount reserved in the lease constitutes a fair and reasonable value.
 
 In re Xonics,
 
 65 B.R. 69, 74 (Bankr.N.D.Ill.1986);
 
 Thompson,
 
 788 F.2d at 563;
 
 Cochise,
 
 703 F.2d at 1354 n. 17. This presumption may be rebutted upon evidence showing that the reasonable worth of the lease differs from the contract rate.
 
 Id.
 
 The court may choose to fix a different amount based on the debtor-in-possession’s actual use,
 
 Peninsula Gunite,
 
 24 B.R. at 593;
 
 cf. Funding Systems Asset Management Corp. v. Key Capital Corp. (In re Funding Systems Asset Management Corp),
 
 72 B.R. 87 (Bankr.W.D.Pa.1987) (administrative expense priority measured in terms of the reasonable value of the leased property, i.e., the contractual rental prorated amount); but that amount cannot exceed “the fair and reasonable value of the lease upon the open market.”
 
 Thompson,
 
 788 F.2d at 563. This limitation acknowledges that the debtor-in-possession or trustee’s liability for actual use and occupancy is not compensatory but rather is founded upon the equitable principle of preventing unjust enrichment.
 
 In re Dixie Fuels, Inc., 52
 
 B.R. 26, 27 (Bankr.N.D.Ala.1985).
 

 The question of the fair market value of the premises occupied by debtor-in-possession before default was not reached by the district court because it had determined that the postpetition leases were not
 
 *708
 
 executed in the ordinary course of business.
 
 See In re Dant & Russell, Inc.,
 
 67 B.R. at 362-63. Therefore, we remand for further proceedings so that the fair market value of debtor-in-possession’s actual use of the leased sites may be determined.
 

 Rejection of Unexpired Postpetition Leases Involving Contaminated Leased Property.
 

 Burlington Northern also contends that it is entitled to administrative expense priority because it is jointly liable under section 101(21) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601(21) (1982), for the cleanup costs on its property caused by the debtor-in-possession’s operation of the wood-treatment facility. Burlington Northern asserts that public policy considerations entitle it to administrative expense priority. In support of its contention that it is entitled to administrative expense priority under section 503(b)(1)(A) for cleanup of the contaminated sites, Burlington Northern cites to and discusses at length, as controlling authority, the Supreme Court’s decision in
 
 Midlantic Nat’l Bank v. New Jersey Dep’t of Environ. Protection,
 
 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).
 
 [9]
 

 Debtor-in-possession claims that Burlington Northern’s claim is not entitled to administrative expense priority because its prospective claim for cleanup costs and its claim for reimbursement of monies already expended on cleanup costs arises from pre-petition activities, thereby constituting a general unsecured claim which is not entitled to administrative expense priority for purposes of sections 503(b)(1)(A) and 507(a).
 

 In
 
 Midlantic,
 
 the Supreme Court expressly reserved the question whether environmental cleanup costs are to be given priority.
 
 Id.
 
 at 507, 106 S.Ct. at 762. Therefore, the district court was correct in concluding that
 
 Midlantic
 
 was not controlling.
 

 However, the leading case, for the instant purposes, is
 
 Ohio v. Kovacs,
 
 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). In resolving whether the injunction constituted a debt or liability of a claim within the meaning of 11 U.S.C. § 101(4) (1982),
 
 [10]
 
 the Supreme Court held that the state of Ohio’s injunction directing the cleanup of a hazardous waste site was no more than a general, unsecured claim.
 
 See id.
 
 at 282-83, 105 S.Ct. at 709-10.
 

 In a similar case,
 
 Southern Ry. Co. v. Johnson Bronze Co.,
 
 758 F.2d 137, 141 (3d Cir.1985), a South Carolina administrative order directing cleanup of a drainage ditch was considered as a general unsecured claim not entitled to priority.
 
 Id.
 
 at 141.
 
 Johnson Bronze
 
 involved a prepetition contractual indemnification claim between Johnson Bronze Company as débtor-in-pos-session and sublessee, and Southern Railway as lessor.
 
 Id.
 
 at 139. Johnson Bronze operated a bearing manufacturing plant which generated hazardous industrial waste. Johnson Bronze acquired a license from Southern Railway to dispose of sewage in a drainage ditch in Southern Railway’s adjacent right-of-way.
 
 Id.
 
 This license required that Johnson Bronze maintain the ditch, restore it to its original condition and indemnify Southern Railway for any liability as a consequence of its use.
 
 Id.
 

 Southern Railway, already deemed a general unsecured creditor, sought administrative expense priority in its claim upon Johnson Bronze’s bankruptcy estate.
 
 Id.
 
 at
 
 *709
 
 140. The Third Circuit concluded that
 
 Ko-vacs
 
 controlled and that Southern Railway’s general unsecured contract indemnity claim should not be given administrative expense priority.
 
 Id.
 
 at 141-42.
 

 Kovacs
 
 and
 
 Johnson Bronze
 
 are significant in that they involved assertions of administrative expense priority by a lessor for cleanup costs resulting from property not owned by the bankruptcy estate. Quite a different result, however, is warranted when the cleanup costs result from monies expended for the preservation of the bankruptcy estate.
 
 See, e.g., Lancaster v. Tennessee (In re Wall Tube & Metal Prod. Co.,
 
 831 F.2d 118, 124 (6th Cir.1987)) (state entitled to administrative expense priority for its response costs from the debtor’s estate under CERCLA);
 
 United States v. Price,
 
 577 F.Supp. 1103, 1110 (D.N.J.1983) (claimants seeking administrative expense priority must incur some expenses before they may properly initiate an action);
 
 In re Mammoth Mart, Inc.,
 
 536 F.2d 950 at 954 (1st Cir.1976) (when third parties are induced to supply goods and services to the debtor-in-possession and when the bankruptcy estate has been benefited, their claim is offered administrative expense priority);
 
 In re Distrigas Corp.,
 
 66 B.R. 382, 386 (Bankr.D.Mass.1986) (to the extent that the state expended funds to cleanup debt- or’s contaminated property (whose property absent cleanup had little or no value), it would be entitled to a first priority administrative expense claim);
 
 In re Vermont Real Estate Inv. Trust,
 
 25 B.R. 804, 806 (Bankr.D.Vt.1982) (expense incurred for work ordered and subsequently performed by City was necessary for preservation of debtor’s estate and was entitled to administrative expense priority);
 
 In re Stevens,
 
 68 B.R. 774, 783 (D.Maine 1987) (state entitled to administrative expense priority for costs it incurred in removing waste from property of the estate). Such a result comports with the plain langauge of 11 U.S.C. § 503(b)(1)(A) (1982 & Supp. IV 1987), which directs that administrative expenses are allowed for “the actual, necessary costs and expenses of preserving the estate.... ” When a claimant expends funds that preserve the estate, treatment as an administrative expense is authorized by the Bankruptcy Code.
 
 See id.
 

 In contrast, damages caused during the prepetition period are not entitled to administrative expense priority. Since the effect of rejection under 11 U.S.C. § 365(g) (1982 & Supp. IV 1987) is to treat the breach of an unexpired lease as occurring prepetition, it follows that consequent damages should likewise be regarded as prepetition.
 
 [11]
 

 Juniper Development Group v. Kahn (In re Hemingway Transport, Inc.),
 
 73 B.R. 494, 503 (Bankr.D.Mass.1987).
 

 Although Burlington Northern asserts that public policy considerations entitle its claims for cleanup costs to administrative expense priority, we acknowledge that Congress alone fixes priorities. 3
 
 Collier on Bankruptcy
 
 ¶1 507.02, at 507-17, (15th ed. 1987). Courts are not free to formulate their own rules of super- or sub-priorities within a specifically enumerated class.
 
 Id.
 
 As Justice O’Connor noted in her concurrence in
 
 Kovacs:
 

 [A] State may protect its interests in the enforcement of its environmental laws by giving cleanup judgments the status of statutory liens or secured claims.
 

 469 U.S. at 286, 105 S.Ct. at 711. But until the Oregon legislature enacts such protective provision or until Congress amends sections 503 and 507 to give priority to claims for cleanup costs, we are without authority to create such a priority.
 

 AFFIRMED in part and REVERSED in part and REMANDED.
 

 [1]
 

 . Paragraph 8 provides that:
 

 Lessee shall not permit the existence of any nuisance on said premises; shall maintain the same in proper, clean, safe and sanitary condition and free and clear of any explosive, flammable or combustible material ... except for such material as may be necessary to Lessee’s business; and further, Lessee shall ... observe ... all federal, state and local regulations, ordinances and laws ... and at Lessee’s sole cost shall make ... improvements, alterations, repairs ... required on said premises by or under any such regulations, ordinances or laws.... Lessee shall ... save harmless, defend and indemnify Lessor from ... costs ... connected with such violation or violations.
 

 Paragraph 9 provides that:
 

 Lessee shall comply with all applicable laws ... of any governmental authority ... controlling environmental standards and conditions on the premises_ Lessee shall ... save harmless, defend and indemnify Lessor from ... costs and expenses ... resulting from ... such violation or violations.
 

 [2]
 

 . Title 11 U.S.C. § 1101(1) (1982) provides that "debtor-in-possession” means debtor in the absence of appointment of a Chapter 11 trustee.
 
 See In re Waterfront Companies, Inc. v. Johnston,
 
 56 B.R. 31, 34 (Bankr.D.Minn.1985).
 

 [3]
 

 . Property as used here presumably includes leasehold interests.
 

 [4]
 

 . Other sections of the code using this term fail to provide a definition or guidelines.
 
 See, e.g.,
 
 11 U.S.C. §§ 364(a) and 547(c)(2)(B) (1982 & Supp. IV 1987).
 
 Travelers Indemnity Co.
 
 v.
 
 Chernicky Coal Co., Inc. (In re Chernicky Coal Co., Inc.), 67
 
 B.R. 828, 833 (Bankr.W.D.Pa.1986);
 
 Armstrong World Inds., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),
 
 29 B.R. 391, 394 (S.D.N.Y.1983).
 

 [5]
 

 .The
 
 Waterfront
 
 court provided the following example: “[R]aising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer’s ordinary business.”
 
 Waterfront,
 
 56 B.R. at 35.
 

 [6]
 

 . The
 
 Phillips
 
 court, in applying this test, determined that the accelerated timing of payments to certain creditors rendered those payments extraordinary.
 
 Id.
 
 at 394-95.
 

 [7]
 

 . The
 
 Waterfront
 
 court, in applying this test, concluded that an indemnity agreement which required shareholder approval was a type of transaction outside the debtor's ordinary course of business.
 
 Waterfront,
 
 56 B.R. at 35. Moreover, courts, in applying the vertical dimension or creditor's expectation test, also consider the debtor's prepetition business activities.
 
 See Johns-Manville,
 
 60 B.R. at 617.
 
 See also In re DeLuca Distrib. Co.,
 
 38 B.R. 588, 594 (Bankr.N.D.Ohio 1984).
 

 [8]
 

 . Section 64(a)(1), the predecessor to section 503(b)(1)(A) used the term "including” (“including the necessary costs of preserving the estate"), Congress in the revised statute deleted this term because of the implication that first priority claims included some addition to those that serve to preserve the bankrupt estate.
 
 See Otte,
 
 419 U.S. at 57, 95 S.Ct. at 256.
 

 [9]
 

 . In
 
 Midlantic
 
 the Supreme Court held that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards. 474 U.S. at 507, 106 S.Ct. at 762.
 

 [10]
 

 . Under section 101(4):
 

 (4) "claim” means—
 

 (A) right to payment, whether or not such right is reduced to judgment, liquidated, un-liquidated, fixed, contingent, matured, unma-tured, disputed, undisputed, legal, equitable, secured, or unsecured; or
 

 (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.
 

 [11]
 

 . Damages here include those resulting from any reversionary leasehold interest held by Burlington Northern.
 
 See (Int’l Coins & Currency, Inc. v. Barmar Corp. (In re Int’l Coins & Currency, Inc),
 
 18 B.R. 335, 338-39 (Bankr.D.Vt.1982).