In re ALLEN CARE CENTERS, INC., an Oregon corporation, Debtor.

Bankruptcy No. 390–36679–P11.

United States Bankruptcy Court, D. Oregon.

Jan. 19, 1994.

Gregg D. Johnson, Portland, OR, for trustee.

Daniel H. Rosenhouse, Portland, OR, for creditor.

S. Ward Greene, Portland, OR, for debtor.

## MEMORANDUM OPINION

POLLY S. HIGDON, Bankruptcy Judge.

This matter is before the court on the chapter 7 trustee's motion for partial summary judgment and the State of Oregon's Senior and Disabled Services Division of the Department of Human Resources' motion for summary judgment. Although through their supporting documents the parties have sniped at each other about certain facts the legally relevant facts are undisputed; consequently the primary legal issue is ripe for decision on the motions.

### FACTS

Prepetition Oregon's Department of Human Resources (hereinafter DHR) had issued a nursing facility license and a residential care facility license to the debtor for Care West Nursing Center (hereinafter Care West). It also had entered into both a nursing facility contract and a residential care facility contract for that facility. However, the state does not base its claim on any rights it had or has under these licenses and contracts. Rather, DHR has filed an administrative expense claim under 11 U.S.C. § 503(b)(1)(A)[1] for $232,695.50 which represents costs it incurred postpetition in operating, transferring residents from and closing Care West.

Although the trustee does not deny that the state holds a claim against the estate arising under state law he opposes DHR's assertion of administrative expense status to the extent of $130,332.99. He does not oppose such status for the claim balance of $102,362.51, which represents payroll expense for services rendered by Care West employees before the state court-appointed trustee was appointed, nor that that amount was actually incurred, reasonable and necessary. If I find that DHR should be allowed administrative expense status for the full amount of its claim I must then determine the extent to which certain of its costs are reasonable and necessary.

Prepetition claims are asserted by means of a proof of claim. § 501. Properly filed proofs of claim constitute prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). Postpetition claims are asserted by filing a request for payment of the claim as an administrative expense. § 503(a). These latter claims do not enjoy a presumption of validity and accuracy. See In re Fullmer, 962 F.2d 1463, 1467 (10th Cir.1992); In re Downtown Inv. Club III, 89 B.R. 59, 64 (9th Cir. BAP 1988); In re Fall, 93 B.R. 1003, 1010 (Bankr.D.Or.1988). As to these requests the proponent must demonstrate that it qualifies for allowance under one of the subsections of § 503(b). In re Hemingway Transport Inc., 954 F.2d 1, 5 (1st Cir.1992). A bankruptcy court has broad discretion in determining whether such a request should be allowed. In re Dant & Russell, Inc., 853 F.2d 700, 707 (9th Cir. 1988). In Oregon Local Bankruptcy Rule 2016–1(a) describes the method by which such requests are to be asserted. Although the local practice requires the filing of a proof of claim the rule does not change the law regarding the burden of proof.

Under O.R.S. 441.277 et seq. the state unilaterally may petition the court for appointment of a trustee to administer a facility such

---

**1.** All statutory references hereinafter are to the Bankruptcy Code, 11 U.S.C. § 101 et seq., unless otherwise indicated.

as Care West[2] or the entity legally responsible for the facility may notify the state of its intent to cease operations and close the facility and the state may then petition for appointment of a trustee.[3] After appointment, if there are insufficient funds from the facility's operation to meet the expenses incurred the state will make the necessary payments from a fund established for that purpose.[4] Such payments constitute a loan to the facility for which the entity legally responsible for the facility is liable. To secure repayment the state is granted a broad lien on "any beneficial interest, direct or indirect, of any person or body legally responsible for the facility operation" and on the real and personal property so used.[5]

The debtor filed bankruptcy under Chapter 11 on December 10, 1990. The case has since been converted to Chapter 7. At the time of filing the debtor operated three nursing facilities including Care West. The debtor's nursing facility contract with DHR for Care West had expired by its own terms before bankruptcy filing. The residential care facility contract with DHR for Care West would have expired by its terms on June 30, 1991. On December 19, 1990 the debtor in possession notified the Senior and Disabled Services Division of DHR that Care West had incurred substantial losses and it wished to meet with the Division to discuss the situation. The parties met and thereafter, on January 16, 1991, on motion of the debtor in possession, the bankruptcy court entered an order authorizing Allen Care to stipulate to the state court appointment of a trustee for the facility pursuant to O.R.S. 441.277 *et seq.* After some further disagreements between the debtor in possession and DHR, the state court appointed the trustee on January 31, 1991. Its order was based on the stipulation of the parties that grounds existed for such appointment. Pursuant to O.R.S. 441.286 those grounds are "that the health and welfare of patients in a facility are now or in the immediate future will be in jeopardy...."

Meanwhile, on January 30, 1991 the bankruptcy court had held a hearing on several motions filed by the parties regarding Care West. As a result of that hearing, on February 11, 1991 Bankruptcy Judge Perris entered an order approving abandonment of the Care West facility:

[E]ffective February 1, 1991 for the reason that the Facility is burdensome to the estate, unless the State of Oregon, Department of Human Resources, Senior and Disabled Services Division obtains the appointment of a trustee pursuant to O.R.S. 441.277 *et seq.* on or before that date.... If the State of Oregon obtains the appointment of a trustee pursuant to O.R.S. 441.-277 *et seq.* on or before February 1, 1991 then Debtor's proposed abandonment of the Facility is approved and the Facility will be deemed abandoned effective on the earlier of 60 days from January 30, 1991, or the date on which all residents of the facility have been transferred from the Facility.

The transcript of the January 30, 1991 hearing makes it clear that the purpose for the language of the February 11, 1991 order was twofold: first, in light of earlier delays by the state in obtaining appointment of the trustee, to encourage it to obtain immediate appointment of the trustee and, second, to eliminate any potential later argument by the debtor in possession that because of the facility's abandonment the state had lost its right to assert an administrative expense claim for the expenses it would incur in closing the facility.

Pursuant to O.R.S. 441.316(3) the trustee may continue to operate a facility not more than 60 days after it receives notice from the body otherwise legally responsible for operating the facility of its intent to close the facility. The debtor in possession sent its official notice of intent to cease operations and to close Care West, which is dated January 30, 1991, to the state appointed trustee. In fact all patients were transferred by the

---

2. O.R.S. 441.286.

3. O.R.S. 441.316(3).

4. O.R.S. 441.303.

5. O.R.S. 441.318(3). The court is unaware of any lien the state is asserting at this time against estate or non-estate property to enforce its right to payment.

state from Care West by April 1, 1991. Therefore, pursuant to the terms of the February 11, 1991 order, the Care West facility was abandoned on March 30, 1991. The parties disagree as to what constituted the "facility" that was abandoned. The real property which Care West occupied was not owned by the debtor in possession. For purposes of this opinion this question need not be resolved.

There were around 80 residents at Care West when the state trustee was appointed. Because it had operated as both a nursing and residential facility the degree of care that each patient required varied. Many were elderly and frail. No evidence was presented to the court that at any time up to the appointment of the state trustee the debtor or debtor in possession had not provided appropriate care for the residents. However, on January 1, 1991 the debtor in possession had filed in bankruptcy court a Motion for Authority to Stipulate to Appointment of State Trustee to Close Facility in which it had stated "Debtor is unable to adequately fund operations, creating threatened staffing problems with the potential to cause physical or mental harm to patients." Due to lack of evidence to the contrary the court assumes that during all relevant times Allen Care Centers, Inc. was not in violation of any state or federal law designed to protect the health and safety of its patients.

During the state court-appointed trustee's operation her operating expenses exceeded her income. Pursuant to statute the state made up the shortfall. The amount reflected in the state's administrative proof of claim consists of the shortfall for the period from her appointment through March 30, 1991.

## DISCUSSION

■ To support its claim to an administrative expense DHR relies on the progeny of bankruptcy cases involving environmental damage which have emerged since the holding in *Midlantic Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). The Court's holding in *Midlantic* was limited to whether, under the facts, the bankruptcy trustee could abandon contaminated estate property under § 554. Therefore, to understand DHR's position, a discussion of bankruptcy law surrounding the allowance of a § 503(b) administrative expense and the impact of *Midlantic* on that law is helpful.

■ In innumerable bankruptcy cases, past and present, one finds a primary bankruptcy thesis recited. If the debtor is in bankruptcy state law is not permitted to prefer a class of unsecured creditors. This is true although the state's motives for so doing are of the highest order. If state law is contrary to the distribution provisions of federal bankruptcy law, state law must yield. *Elliott v. Bumb,* 356 F.2d 749, 754–55 (9th Cir.1966), *cert. denied, Schutzbank v. Elliott,* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966); *In re Professional Bar Co., Inc.,* 537 F.2d 339, 340 (9th Cir.1976); *In re Leslie,* 520 F.2d 761, 763 (9th Cir.1975).

> Under the Supremacy Clause of Article VI of the United States Constitution, when enforcement of a state law or regulation would undermine or stand as an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting a federal statute, the conflict must be resolved in favor of the federal law.

*In re Smith–Douglass, Inc.,* 856 F.2d 12, 15 (4th Cir.1988) (citing *Hines v. Davidowitz,* 312 U.S. 52, 66–67, 61 S.Ct. 399, 403–04, 85 L.Ed. 581 (1941)).

In *Midlantic* the implementation of the state's environmental statutes conflicted with § 554(a) of the Bankruptcy Code which allows a trustee to abandon property which is of inconsequential value and a burden to the estate. The Court, by a plurality of 5 to 4, held that although the property was burdensome and of inconsequential value, Congress did not grant the trustee power, through § 554(a), to abandon property in contravention of state or local laws designed to protect public health or safety from identifiable hazards. The dissent disagreed that Congress intended to limit the "seemingly unqualified" language of § 554(a). The theme of the primacy of federal law over state law in bankruptcy echoes in its statement that "the Bankruptcy Court may not enforce its view of sound public policy at the expense of the

interests the Code is designed to protect." *Midlantic*, 474 U.S. at 514, 106 S.Ct. at 766. Noting that the state was not only interested in protecting public health but also its public fisc, the dissent anticipated the subsequent cases involving issues of priority of distribution which *Midlantic* has spawned.

Since *Midlantic*, courts have faced requests for administrative expense priority from those who have provided any necessary environmental cleanup costs.[6]

■ The Bankruptcy Code provides preference of payment out of the estate for certain administrative expenses. *See* § 507(a)(1). The category of these expenses appears in § 503(b). With the exception of post *Midlantic* cases involving administrative claims for environmental cleanup costs this Code section and its predecessor under the Bankruptcy Act, Section 64, generally have been construed narrowly. In Chapter 7 the primary goal is to keep costs to a minimum, thus preserving the limited estate assets.[7] In a Chapter 11 reorganization of an ongoing business a further reason for granting this priority is to encourage third parties to provide goods and services necessary for the continued operation of the estate. *In re Christian Life Center*, 821 F.2d 1370, 1373 (9th Cir.1987) (citing *Yermakov v. Fitzsimmons (In re Yermakov)*, 718 F.2d 1465, 1470 (9th Cir.1983)). However, to obtain this priority these claims, too, must be shown to have provided actual benefit to the estate. *In re Palau Corp.*, 139 B.R. 942, 944 (9th Cir. BAP 1992); *but see In re N.P. Mining Co. Inc.*, 963 F.2d 1449, 1454 (11th Cir.1992).

In the Ninth Circuit the definitive case addressing administrative expense allowance for the cleanup costs of environmental damage is *In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988). In *Dant* the court rejected a lessor's request for an administrative expense allowance under § 503(b)(1)(A) for cleanup costs. A careful reading of that case indicates that the ruling was based on two findings: first, because the property was not owned by the debtor in possession costs of

---

6. Both before and after *Midlantic* in cases involving claims for administrative expense under § 503(b) other than for environmental ·cleanup the courts generally have held that one of the qualifications for an administrative expense is that the claim must have arisen post petition. *See Matter of Pacific Far East Line, Inc.*, 713 F.2d 476, 478 (9th Cir.1983); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976); *In re Palau Corp.*, 139 B.R. 942 (9th Cir. BAP 1992). Whether a claimant who wants to obtain the cleanup costs for environmental damage is a "creditor" who holds a "claim" that "arose at the time of or before the order for relief" within the definition of 11 U.S.C. § 101(5) and (10) or, on the contrary, holds a claim which arose post-petition is a difficult issue in itself. Courts have developed differing "tests" in reaching their conclusions on this issue. *See In re Chateaugay Corp.*, 944 F.2d 997, 1009–10 (2d Cir.1991) (establishing a "relationship" test). The Ninth Circuit Court of Appeals recently adopted what has been called the "fair contemplation" test in finding that California's claim for cleanup costs to have arisen prepetition and therefore subject to discharge. *In re Jensen*, 995 F.2d 925, 930–31 (9th Cir.1993). In environmental cases, however, despite either facts that suggest, or a finding, that the claim arose prepetition, some courts then are allowing, as an administrative expense claim, cleanup costs associated with that claim incurred post petition with respect to property then owned by the debtor. This allowance is based on the directive in *Midlantic*, 474 U.S. at 502, 106 S.Ct. at 760 (citing *Ohio v. Kovacs*, 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985)), that a debtor must operate in accordance with regulations in place for the protection of the public health and safety from environmental hazards. *See In re N.P. Mining Co. Inc.*, 963 F.2d 1449 (11th Cir.1992); *Chateaugay Corp.*, 944 F.2d at 1009; *In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 122–24 (6th Cir. 1987); *In re National Gypsum Co.*, 139 B.R. 397, 413 (N.D.Tex.1992); *In re Stevens*, 68 B.R. 774, 780–81 (D.Me.1987). Simply put, if contaminated estate property cannot be abandoned and the trustee must operate according to the requirements of environmental laws designed to protect the public welfare and safety then the expense attendant upon cleaning up the contamination must be an actual, necessary cost of preserving the estate ·under § 503(b)(1)(A) whether or not the expense results in actual benefit to the estate. Other courts, under facts indicating that the claim arose prepetition, will not allow administrative expense status for continuing cleanup costs incurred postpetition. *See Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3rd Cir. 1985) (following *Ohio v. Kovacs* and decided before *Midlantic* was released). Under the facts before me, the court need not address these issues as it is uncontested that DHR's claim arose post petition.

7. *See Otte v. United States*, 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974); *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir.1988).

cleanup would not preserve the estate for the benefit of creditors; second, the debtor in possession having rejected the lease, § 365(g) mandated that damages arising therefrom, *including consequential damages to the reversionary leasehold interest*, must be treated as a general unsecured claim.

 Although *Dant's* ruling is based on facts which vary from those before this court, *Dant* contains significant dicta which provides guidance to a trial court in this circuit when addressing a request for allowance under § 503(b)(1)(A). First, the statute is to be narrowly construed. *Id.* at 706. Second, "[a]n actual [not potential] benefit must accrue to an estate." *Id.* In either a Chapter 11 liquidation or a Chapter 7 the court should be more concerned with maximizing the size of the estate for the creditors than with inducing third parties to contribute towards the continued operations of the business. *Id.* at 706–07. Third, the court should consider allowing a claim under § 503(b)(1)(A) for costs incurred if the expense results in a preservation of estate assets for the benefit of creditors. Finally, courts are not free to establish their own priorities of payment within the Bankruptcy Code.

DHR asserts that *Dant* and three of the cases it cites, *In re Wall Tube & Metal Prod. Co.*, 831 F.2d 118 (6th Cir.1987); *In re Stevens*, 68 B.R. 774 (D.Me.1987); and *In re Vermont Real Estate Inv. Trust*, 25 B.R. 804 (Bankr.D.Vt.1982), support its position that if postpetition expense is incurred with respect to the debtor's property which was required by state statutes and regulations intended to protect the public health and welfare such expense is to be allowed an administrative expense priority.

In *Stevens* prepetition both the state and federal government had made certain demands on the debtor regarding the storage and disposal of oil on his property. Postpetition although the trustee did not formally abandon the property, she refused to use estate funds for the removal and the state incurred the expense of removing the hazard. Rejecting the argument that because the state held a claim which arose prior to the filing it was not entitled to an administrative expense claim for the costs it incurred in the removal the court stated:

> *Midlantic* has altered the criteria for determining the allowance of administrative expenses under Bankruptcy Code § 503(b)(1)(A) ... *Midlantic* leaves no room for the estate to avoid the administrative expense attendant upon its possession of hazardous waste, except upon the acquiescence of the public authorities whose ultimate legal obligation it is to protect the public health and safety from hazardous waste abandoned by those responsible for its existence.

*Stevens*, 68 B.R. at 780–81. Further, it found that 28 U.S.C. § 959(b), as interpreted by the *Midlantic* Court, required the trustee comply with valid state laws affecting property. Consequently the cleanup of the hazardous waste remained the responsibility of the estate.[8]

Citing *Midlantic* and 28 U.S.C. § 959(b), in *Wall Tube* the court allowed an administrative expense claim to Tennessee for postpetition response costs. Prepetition the state had issued the debtor a notice of violation of its Hazardous Waste Act for waste it stored on property it held under a twenty year lease.

Prepetition the debtor in *Vermont* had entered into a lease of a building which subsequent to its Chapter 11 filing it had continued to use. A part of the premises then collapsed and was declared a dangerous condition by the city of Montpelier. The city ordered the debtor to demolish the building,

---

8. 28 U.S.C. § 959(b) provides:

Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated,

in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

The *Midlantic* plurality found this statute to be "additional evidence" that Congress did not intend for the Bankruptcy Code to preempt all state laws. *Midlantic*, 474 U.S. at 505, 106 S.Ct. at 761.

remove the debris and fill the cellar hole. The debtor filed a motion to reject the lease. At the hearing on the motion the court ordered the debtor to pay for the work ordered. Subsequently, the debtor having failed to act, the city incurred the expense to remedy the problem and was allowed an administrative expense claim for its costs. Seemingly ignoring the debtor's attempt to reject the lease the court stated:

> [T]he work ... was not only necessary for the preservation of the leasehold as part of the debtor's estate but it was also a matter of necessity for the safety and welfare of the public in general.

*Vermont*, 25 B.R. at 806.

This court concludes that DHR is not entitled to an administrative expense claim for the shortfall of $130,332.99 arising from the state trustee's operation and closure of the Care West facility. My reasons follow.

▇ When the debtor in possession informed DHR of its decision to close Care West it had determined that it was financially necessary to do so. Admittedly it took this step in an attempt to preserve the remainder of the estate for a hoped for successful reorganization. With Care West, however, it found itself in the same circumstance with regard to the requirements of O.R.S. 441.277 *et seq.* as would have a Chapter 7 trustee when totally liquidating the estate. If this court were to grant an administrative expense claim under our facts any government entity which incurred postpetition costs in assuring the public health and safety upon liquidation of Chapter 7 estate property would be entitled to an identical claim. It is not enough to state simply that the expense was incurred postpetition with regard to estate property to protect the public health and welfare. If these criteria were sufficient to support a claim under § 503(b)(1)(A) the court on occasion would have to read out of that statute the words "necessary" and "of preserving the estate". This is because such state expenses would not always aid in preserving the estate. This result is contrary to the dicta of *Dant* which instructs us that in exercising our discretion in granting an administrative expense claim under § 503(b)(1)(A) in a liquidation proceed-

ing our primary concern should be to maximize the estate for distribution to creditors.

When the debtor filed its Chapter 11 petition its Care West nursing facility contract with DHR had expired by its own terms. However, its Care West residential care facility contract had not. Although it never filed a formal motion to reject this latter contract the debtor in possession's notice of cessation of operations sent to the state trustee on January 30, 1991 pursuant to O.R.S. 441.-316(3) served actual notice to DHR that it would no longer follow the terms of that contract. Thereafter the trustee carried out its responsibilities under the state statute. If the debtor initially had filed a Chapter 7 proceeding, if the contract were executory, the trustee either would have rejected it pursuant to § 365(a), or it would have been deemed rejected within sixty days of entry of the order for relief pursuant to § 365(d). Thereafter DHR would have carried out the same responsibilities under O.R.S. 441.277 *et seq.* and probably incurred similar expense as it did here. *Dant* points out that § 365(g) treats such rejection as a breach of the contract occurring prepetition and states that consequential damages arising from such breach are also to be treated as arising prepetition. Consequently, this court cannot justify granting an administrative expense claim to DHR for its costs simply because the debtor in possession never formally rejected the residential care facility contract under § 365(a) while this case was in Chapter 11.

In bankruptcy cases involving environmental hazard issues the courts, following the lead in *Midlantic*, have interpreted 28 U.S.C. § 959(b) to require the trustee or debtor in possession to manage and operate the property of the estate according to the requirements of state laws. In all these cases the bankrupt entity has either violated or been perceived as potentially violating state environmental laws. Contrarily, under our facts, first in operating, and then in choosing to close the Care West facility, the debtor in possession violated no state laws. In closing Care West it simply took advantage of laws in place for that purpose. Indeed, by following the statutory procedure the debtor in

possession assured that, despite Care West's debt ridden finances, the residents' needs would be adequately met during the closing process. The overriding concern voiced in the environmental cases that the estate be required to meet the requirements of state law plays no role under our facts.

Despite the exception for environmental cleanup costs arising in cases subsequent to *Midlantic*, *Dant* instructs that § 503(b)(1)(A) is to be narrowly construed and that this court is not free to establish its own subset of payment priorities under the Code. Given these directives DHR has a heavy burden in demonstrating that providing priority to its expense accomplishes the same policy goals as have been deemed important enough by a number of courts to grant an administrative expense priority for environmental cleanup costs. DHR has not carried that burden. Generally the courts which have granted an administrative expense priority for environmental cleanup costs have justified such grant for the following reason. Under *Midlantic* the estate cannot abandon contaminated estate property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards. Consequently environmental cleanup costs on such property must be borne by the estate as a cost of operation or of liquidation. As such they are § 503(b)(1)(A) administrative expenses. If the estate does not bear this cost the third party who does may receive reimbursement as an administrative expense. The fact that at times these costs will reduce rather than "preserve the estate" appears of no consideration in light of the requirements that *Midlantic* has placed on the trustee.

Attempting to apply this reasoning to the circumstances in which it earlier had found itself DHR had argued before Judge Perris that the bankruptcy court should not allow the debtor in possession to abandon the Care West facility absent assurance it would receive administrative expense status for any cost it incurred for its closure.[9] But the policy concerns expressed by the *Midlantic* plurality and which are the basis for the post *Midlantic* administrative claim cases arose out of a very different set of facts than those that are before this court. In *Midlantic* and in all the other bankruptcy cases involving costs for environmental damage there has existed a state statute or regulation which placed affirmative duties on entities in order to protect the public welfare and safety from environmental degradation. In these cases the failure of the bankrupt entity, either pre or post petition, to follow the dictates of the statute led to significant danger to the public at large. The *Midlantic* Court held that this failure created a threat to the public which was unacceptable and which the trustee had to address.

Here the costs DHR incurred to close Care West were not the result of the debtor in possession's failure, either pre or post petition, to follow the requirements of state law. On the contrary, the costs arose simply as a result of the nature of the debtor in possession's business and its decision to close it. The decision to close Care West rested on its negative cash flow and was made in order to aid it in its attempt to successfully reorganize its business. Chapter 11 incorporates a number of provisions which support decisions of this nature at the least expense to the estate.[10] As the Supreme Court stated in *Ohio v. Kovacs*, 469 U.S. at 286, 105 S.Ct. at 711, a state may protect the costs of enforcing its state's laws by providing for statutory liens.[11] Indeed O.R.S. 441.318(3) provided this protection to DHR.

"An actual benefit must accrue to the estate." *Dant*, 853 F.2d at 706. The debtor in possession did not receive any direct financial benefit from the closure of Care West. After the state court-appointed trustee took control

---

9. Judge Perris announced she could not determine entitlement to an administrative expense claim prior to the expense being incurred.

10. For example, a shrinking business may reject certain executory contracts and leases. As mentioned earlier, damages sustained by the other parties to those rejected contracts and leases are treated as a general unsecured claim under § 365(g). A debtor in possession may also attempt to reduce the size of secured claims under § 506(d), and reject collective bargaining agreements under § 1113.

11. *See Dant*, 853 F.2d at 709.

of Care West she collected the facility's accounts receivables and used them to finance the operations and closure. The state met the shortfall of funds for this purpose. One may speculate that after the debtor in possession sent its notice of termination to the trustee on January 30, 1991 if the state had not exercised its statutory responsibility one or more residents may have had a claim for damages against the estate. However, such speculation is too attenuated to support a § 503(b)(1)(A) claim. The benefit to the estate must be actual, not potential. *See id.* Further, assuming without deciding that if the debtor in possession had had the funds from its other nursing homes to finance the closure of Care West it should be required to reimburse DHR for its closing expenses as an administrative expense, DHR has not proved that such was the case.

*Wall Tube* and *In re Stevens* cited by DHR in support of its position are distinguishable on their facts. In each of these cases, as with *Midlantic,* the administrative claim arose from the debtor's failure to abide by environmental laws. For the reasons stated, the environmental cases are not precedent for DHR's request.

This court believes that the holding in *Vermont* is contrary to the directives for administrative expense found in *Dant.* Because the debtor was the lessee of the property and wanted to reject the lease because the building had been destroyed, the expenditure of funds for demolition probably did not provide an actual benefit to the estate.

DHR has provided this court no case citations wherein the concerns expressed in *Midlantic* and followed in subsequent environmentally based administrative claim cases has been applied to a state's postpetition *non*-environmentally based claim.

The trustee has cited *In re Woodstock Associates I, Inc.,* 120 B.R. 436 (Bankr. N.D.Ill.1990), in support of its motion. In *Woodstock* the debtor/subtenant of four nursing homes ceased its operations and the state had a receiver appointed under a state stat-ute similar to O.R.S. 441.277 *et seq.* The mortgagee advanced some funds to the receiver to aid in the operation and closure of the homes and subsequently sought an administrative claim under § 503(b) for reimbursement. The court denied the request. Because the receiver was appointed and operating the homes prepetition the mortgagee's expenditure did not arise from operation of any postpetition business of the debtor. Second, the court found the debtor's *estate,* as opposed to individual residents, did not benefit from the expenditure. The usefulness of this case for precedent for the trustee's position is significantly undermined by the fact that at the time the debtor filed bankruptcy it was no longer running the homes.

There is another line of cases not cited by DHR which, under a narrow set of circumstances, may support a claim under § 503(b)(1)(A) although no benefit to the estate may accrue from the expense. In 1968 in *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751, the Supreme Court, on grounds of fundamental fairness, allowed an administrative expense priority under Section 64(a)(1), the predecessor of § 503(b)(1)(A), as an "actual and necessary cost" of operating a business. In this Chapter XI proceeding fire losses were sustained through the receiver's negligence. Over the objection of the trustee the Court allowed the request for the losses although the payment would not benefit the estate nor facilitate the debtor's postpetition business. However, *Reading* and other subsequent cases which have applied its rationale have done so only when an injury has occurred from wrongdoing committed postpetition by the trustee or debtor in possession during operation of its business.[12] As Allen Care Centers, Inc. has committed no wrongdoing this line of cases does not support DHR's administrative expense request.

Section 348(d) provides that a claim against the estate that arises after the order of relief but before conversion in a case that

---

12. *See In re Charlesbank Laundry, Inc.,* 755 F.2d 200 (1st Cir.1985) (postpetition fine occasioned by an operating chapter 11 debtor in possession's intentional disregard of a state court order enjoining local zoning ordinance violation); *In re Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp.,* 443 F.2d 867 (2nd Cir.1971) (damages for patent infringement).

is converted under § 1112, other than a claim treated under § 503(b), shall be treated as if the claim had arisen prepetition. Since filing, this case has been converted under § 1112 to Chapter 7. Therefore DHR holds an allowed general unsecured claim in the amount of $130,332.99.

This memorandum opinion contains the court's findings of fact and conclusions of law and pursuant to Fed.R.Bankr.P. 7052, and they will not be separately stated.

### ORDER GRANTING PARTIAL SUMMARY JUDGMENT AND DENYING CROSS MOTION FOR SUMMARY JUDGMENT

The court having entered its Memorandum Opinion in this matter on January 19, 1994, and based thereon;

IT IS HEREBY ORDERED that the motion for partial summary judgment, filed by Ronald G. Witcosky, chapter 7 trustee in objection to the administrative expense priority claim of the Oregon Department of Human Resources, is granted; and

IT IS FURTHER ORDERED that the motion for summary judgment, filed by the Oregon Department of Human Resources in support of its administrative expense priority claim, is denied.