In re DANT AND RUSSELL, INC.,
et al., Debtors.

**BURLINGTON NORTHERN
RAILROAD CO., Appellant,**

v.

**DANT & RUSSELL, INC., Appellee.**

**Civ. No. 86–0746–PA.**

United States District Court,
D. Oregon.

Nov. 20, 1986.

Paul T. Fortino, Perkins Coie, Portland, Or., Richard A. White, Perkins Coie, Seattle, Wash., for appellant.

Richard C. Josephson, Richard D. Bach, Bruce A. Thomas, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for appellee.

PANNER, Chief Judge.

Burlington Northern Railroad Company ("BN") appeals the decision of Bankruptcy Judge Donal D. Sullivan, pursuant to 28 U.S.C. § 158(a). I affirm the Bankruptcy Court's decision.

## FACTS

Debtor Dant and Russell, Inc., ("D & R") operated a wood treatment plant and storage facilities on two parcels of land from 1972 until December 1983. Logs were stored at the Vadis site, and then treated with creosote and other chemicals at the North Plains site.

The majority of the land at each site was owned in fee by D & R. A portion of the land at each site was owned by BN, and leased to D & R.

On November 22, 1982, D & R filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code (Title 11, U.S.C.). On March 1, 1983, D & R's president executed new leases with BN for the North Plains and Vadis sites. BN knew that D & R filed under Chapter 11, and therefore insisted on short-term, five-year leases instead of the previous fifteen year leases. D & R continued to operate these sites for more than a year after filing the petition.

D & R entered into the new leases without consulting bankruptcy counsel or seeking court approval. D & R's president stated that he failed to seek court approval for the new leases, because he believed that the new leases merely extended the existing leases and the status quo. He also stated that he thought he was acting on behalf of the debtor and not the debtor in possession, even though the post-petition leases were to the sole benefit of the estate. Record at 27. Baldwin testified that he attempted to keep any liability under the leases as prepetition indebtedness.

The leases contained several provisions pertaining to environmental hazards. These provisions are identical in both leases. Paragraph 8 provides:

8. Lessee shall not permit the existence of any nuisance on said premises; shall maintain the same in proper, clean, safe, and sanitary condition and free and clear of any explosive, flammable or combustible material ... except for such material as may be necessary to Lessee's business; and further, Lessee shall ... observe ... all federal, state and local regulations, ordinances or laws, ... and at Lessee's sole cost shall make ... improvements, alterations, repairs and additions ... under any such regulations, ordinances, or laws.... Lessee shall ... save harmless, defend and indemnify Lessor from ... costs connected with such violation or violations.

Paragraph 9 provides:

9. Lessee shall comply with all applicable laws ... of any governmental authority ... controlling environmental standards and conditions on the premises.... Lessee shall ... save harmless, defend and indemnify Lessor from ... costs and expenses ... resulting from ... such violation or violations.

Paragraph 14 provides that Lessee agrees to restore the premises to a condition satisfactory to the Lessor before abandoning the premises.

The State of Oregon Department of Environmental Quality ("DEQ"), subsequent to the execution of the post-petition leases, identified both sites as contaminated with creosote, chromium, arsenic, pentachlorophenol, and other hazardous wastes. The hazardous wastes were, at least in large measure, the result of D & R's operations since 1972.

On January 2, 1985, DEQ wrote BN a letter which stated that D & R failed to respond to requests for on-site investigations, "indicat[ing] that its [D & R's] creditors will not allow the expenditure of funds for environmental investigations or even removal of hazardous wastes stored on-site." The letter noted that "significant concentrations" of pentachlorophenol were found in the creek and the groundwater near the North Plains site, and that the City of North Plains and North Plains Elementary School draw drinking water from within one-quarter mile of the contaminated property. BN notes that a subsequent, unidentified, Environmental Protection Agency ("EPA") study also found dioxins at the site which have been linked to an increased incidence of liver cancer in the area.

BN claims to have spent in excess of $250,000 to mitigate the most serious hazards under an agreement with EPA. BN, however, has not yet cleaned up the site.

## PROCEDURAL HISTORY

BN filed a Supplemental Proof of Claim with the Bankruptcy Court, requesting administrative priority for the clean-up costs at the site. D & R moved to reject the post-petition leases, to deny BN's assertion of administrative priority, and requested a section 502(c) estimation of liability.

Judge Sullivan deferred estimating the claim, but granted D & R's other motions. The court held that the post-petition leases were avoidable under section 549(a), because they were transactions unauthorized by the court or the Code. The court found that execution of the post-petition leases was not in the ordinary course of business and without notice or a hearing. The court

approved neither the holdover tenancy nor the post-petition leases, and therefore disallowed BN's attempt to gain administrative priority. 61 BR 668 (1985).

## STANDARD OF REVIEW

Findings of fact must be upheld unless clearly erroneous. Legal conclusions are reviewed *de novo*. Bankr.R. 8013; *In re Summit Creek Plywood Co.*, 5 B.R. 815, 817 (D.Or.1980).

## DISCUSSION

A. *Validity Of The Post-Petition Leases.*

Bankruptcy Code § 363(b) requires notice and a hearing before the debtor in possession may use, sell, or lease property of the bankruptcy estate other than in the ordinary course of business. "Notice and a hearing" requires notice as is appropriate under the circumstances, and a hearing if requested. 11 U.S.C. § 102. In order to be valid, a lease of property must either be in the ordinary course of business under 11 U.S.C. § 363(c), or occur after notice and a hearing.

The post-petition leases were entered into without prior notice or a hearing. D & R's president and BN simply executed the leases without court approval or notice to interested parties. They are therefore invalid, unless they were entered into in the ordinary course of business under 11 U.S.C. § 363(c).

The president of D & R testified that he understood the post-petition leases to merely extend the parties' existing prepetition obligations. BN argues that this shows the leases were entered into in the ordinary course of D & R's business.

Statements of intent are irrelevant in determining whether or not a transaction is made in the ordinary course of the debtor in possession's business. The subjective intent of the debtor in possession does not rewrite the Bankruptcy Code. *Standard Sanitary Mfg. Co. v. United States*, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107 (1912)

(Sherman Antitrust Act could not be avoided by good motives of party).

■ Dealing in real estate or leases was not D & R's ordinary business. D & R treated and sold wood products. Although necessary to its business, entering into leases was not an everyday, run of the mill transaction for D & R. The purpose behind 11 U.S.C. § 363 is to allow businesses to continue their daily operations without incurring the burden of obtaining court approval or notifying creditors for minor transactions, while protecting secured creditors and others from the dissipation of the estate's assets. H.R.Rep. No. 595, 95th Cong., 1st Sess. 181–82 (1977) *reprinted in* 1978 U.S.Cong. & Ad.News 5787, 6141, 6142. In light of this legislative purpose, the post-petition leases were not entered into in the ordinary course of business. The estate is not liable by virtue of the post-petition leases. *In re First International Services Corp.,* 25 B.R. 66, 70 (Bankr.D.Conn.1982) (agreement to sell shares of stock without notice and opportunity for comment held void).

### B. *D & R's Liability For The Holdover Period.*

BN and D & R entered into the post-petition leases on March 1, 1983. Between the date the petition was filed, November 22, 1982, and March 1, 1983, D & R continued to operate the wood treatment plant.

■ Filing for reorganization under Chapter 11 creates a bankruptcy estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). No formalities are required to allow a bankruptcy estate to continue operating under a prepetition lease. *In re Pacific Express, Inc.,* 780 F.2d 1482, 1487 (9th Cir.1986). A prepetition lease under which the debtor in possession continued to operate may be rejected under 11 U.S.C. § 365(d)(2) at any time prior to the confirmation of the plan. *In re Shoppers Paradise, Inc.,* 8 B.R. 271, 278 (Bankr.S.D.N.Y. 1980).

■ D & R's plan had not been confirmed when the Bankruptcy Judge rejected the prepetition leases upon D & R's motion. The leases were properly rejected under 11 U.S.C. § 365(d)(2). The prepetition leases never came into the debtor in possession's bankruptcy estate. *In re Bildisco,* 682 F.2d 72, 78 (3d Cir.1982), *aff'd sub nom. NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

Because the leases never came into the bankruptcy estate, all claims against the debtor in possession take the form of claims by unsecured general creditors. Such claims are not entitled to administrative priority. 11 U.S.C. § 365(g); 2 Collier on Bankruptcy ¶ 365.08 (15th ed. 1986). Post-filing claims are limited to the fair value for the use of the premises only. *In re Peninsula Gunite, Inc.,* 24 B.R. 593, 594 (9th Cir.1982); 2 Collier on Bankruptcy ¶ 365.03.

The bankruptcy estate of D & R is liable to BN for a reasonable amount of rent for the North Plains and Vadis properties during the holdover period. These claims are general unsecured claims dating back to November 21, 1982, the date before D & R filed its petition. 11 U.S.C. § 365(g). BN is not entitled to administrative priority for these claims.

### C. *Rejection Of Leases Of Environmentally Contaminated Properties.*

■ After the opinion below issued, the Supreme Court decided *Midlantic National Bank v. New Jersey Department of Environmental Protection,* —— U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859, *reh. denied,* —— U.S. ——, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986). BN argues that *Midlantic* compels a decision in its favor.

*Midlantic* involved a waste oil processor, Quanta Resources Corp. ("Quanta"), that violated its operating permit by accepting PCB-contaminated oil at locations in New York and New Jersey. The New Jersey Department of Environmental Protection ordered the New Jersey site closed down, and began negotiations with Quanta for

cleaning up the toxin. Before negotiations were concluded, Quanta filed for reorganization under Chapter 11. The proceeding was subsequently converted to Chapter 7. The trustee initiated proceedings to abandon the property under 11 U.S.C. § 554(a). The Court analyzed the abandonment rule, concluding· that "a trustee could not exercise his abandonment power in violation of certain state and federal laws" designed to protect public health and safety from recognized hazards creating serious imminent dangers.

There are three important distinctions between *Midlantic* and the present case. In light of the fact that *Midlantic* is a narrow holding, these distinctions render *Midlantic* inapposite. *See In re Oklahoma Refining Co.*, 63 B.R. 562 (Bankr.W.D.Okla.1986). (*Midlantic* exception to a trustee's abandonment power is narrow).

First, *Midlantic* dealt with the abandonment of property, pursuant to 11 U.S.C. § 554(a). *Midlantic* did not decide whether a lease of contaminated property could be rejected under 11 U.S.C. § 365(d)(2), as in the case at bar. Rejection is a different issue from abandonment.

Second, in *Midlantic* the States of New Jersey and New York would have had to pay for the clean-up of debtor's toxic wastes. In the section 365(d)(2) rejection of lease context, the landlord is still available to clean up the site.[1] BN knew that D & R was using the leased property as a wood treatment facility, and must accept the benefits as well as the burdens of its arms length transaction.

Third, in *Midlantic*, the debtor filed for protection under the bankruptcy laws after being notified of its liability for the clean-up on one site. The *Midlantic* debtor also knew of its potential liability for the contamination of another site. There is no evidence that D & R filed for reorganization under Chapter 11 in order to escape from liability for the contamination of the sites. DEQ letters show that D & R was not informed of the contamination until January 13, 1984, a date well after D & R's petition was filed. The case at bar is thus factually distinquishable from *Midlantic*.

*Midlantic* simply does not extend as far as BN argues. *See also In re Commercial Oil Service, Inc.*, 58 B.R. 311 (Bankr.N.D.Ohio 1986) (Chapter 7 case could be dismissed where state and federal environmental officials would take clean-up action, and no imminent harm to the public existed); *Cournoyer v. Town of Lincoln*, 790 F.2d 971 (1st Cir.1986) (automatic stay inapplicable where governmental unit seeks to enforce its environmental protection laws); *In re Franklin Signal Corp.*, 65 B.R. 268 (Bankr.D.Minn.1986) (fourteen drums of hazardous waste could be abandoned under *Midlantic* when the public health not in direct danger).

The Bankruptcy Code applies to situations involving the improper disposal of hazardous wastes. *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). The Supreme Court carved out a narrow exception to this rule for the abandonment of contaminated property in *Midlantic*. The exception does not extend beyond the abandonment of property. The Bankruptcy Code applies to the case at bar.

## CONCLUSION

The majority, if not all, of the contamination of the North Plains and Vadis sites occurred prior to the time D & R filed its petition for reorganization. There is no exception to allow BN a preference for its environmental clean-up costs. Because the post-petition leases are void, there is also no basis for giving BN's clean-up costs

---

1. A landlord may be liable for the clean-up of a contaminated toxic waste site. For example, 42 U.S.C. § 9607(a)(2) imputes liability to the owner of any hazardous waste site, as well as to the operator of a site. *See also Annot.*, 39 A.L.R.2d 973 (1955) (landlord's liability for nuisance created by tenant). Ore.Rev.Stat. 466.205 imposes liability on "[a]ny person having the care, custody or control of a hazardous waste ... [or] who causes or permits any disposal of such waste...." This opinion does not decide BN's liability or potential liability for clean-up of the sites.

administrative priority. The decision of the Bankruptcy Court is affirmed.