**In re Daniel C. HANNA, Debtor.**

**GULL INDUSTRIES, INC., an Oregon corporation, and BP Oil Company, an Ohio corporation, Appellants/Cross–Appellees,**

**v.**

**JOHN MITCHELL, INC., Trustee of the Estate of Daniel C. Hanna and Daniel C. Hanna, Appellees/Cross–Appellants.**

**BAP Nos. OR–92–2283–VMeJ, OR–92–2285–VMeJ.**
**Bankruptcy No. 390–33990–S11.**
**Adv. No. 90–3388S.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted July 22, 1993.

Decided June 15, 1994.

Ronald T. Adams, Black, Helterline, Portland, OR, for appellants/cross-appellees.

John C. Cahalan, Dunn, Carney, Allen, Higgins & Tongue, Portland, OR, for appellee/cross-appellant.

Before VOLINN, MEYERS and JONES, Bankruptcy Judges.

## OPINION

JONES, Bankruptcy Judge:

### BACKGROUND

The debtor, Daniel C. Hanna ("Hanna"), and appellant, Gull Industries, Inc. ("Gull"), owned adjacent filling stations in Gresham, Oregon. Both filling stations leaked petroleum products into the soil, causing contamination. However, only Hanna's leakage reached the groundwater. The contamination of the groundwater is apparently a slow, continuing process which occurs after the soil is saturated with petroleum.

Gull began cleaning up its site in August 1989, in conjunction with the sale of its property to BP Oil Company ("BP"). That sales agreement required Gull to clean up environmental damage to the site according to a specific timetable. *Findings of Fact and Conclusions of Law* (4–7–92) at 7. Gull hired Applied Geotechnology, Inc. ("AGI") to perform a site assessment and cleanup which eventually cost about $130,000. AGI deter-

mined that the groundwater beneath the Gull site was contaminated by one to three inches of free petroleum product. The bankruptcy court found that "Gull asserted and proved at trial that contaminated subsurface water continued to migrate to its land from the polluted Hanna land. . . ." *Findings* (4–7–92) at 3.

After beginning its remediation efforts by installing three twenty-four inch recovery wells on the Gull site in June 1990, Gull demanded that Hanna stop the flow of contamination from the Hanna site to the Gull site.[1] About a week later on July 27, 1990, Hanna filed for relief under Chapter 11. Three days later the bankruptcy court appointed John Mitchell, Inc. ("Mitchell"), as Chapter 11 trustee.

Gull continued its remediation efforts by installing an "air stripper" to clean the groundwater, and on August 24, 1990, brought an adversary complaint seeking injunctive relief and tort damages under Oregon Revised Statute § 465.255. Gull asked that these claims be treated as administrative expenses under 11 U.S.C. § 503.[2]

In October 1990, Mitchell emptied the leaking underground storage tanks on Hanna's site, and in April 1991 removed them; however, he failed to remove the underlying contaminated soil or to perform a site study as directed by the bankruptcy court in its December 13, 1990 order.

On April 7, 1992, the bankruptcy court denied administrative status but concluded that Gull's expenses were "remedial action costs" recoverable as a general unsecured claim under O.R.S. § 465.255. Gull now appeals the denial of administrative status, and Mitchell cross-appeals the granting of the general unsecured claim. We affirm both.

## STANDARD OF REVIEW

We review for an abuse of discretion the bankruptcy court's award or denial of administrative claims pursuant to 11 U.S.C. § 503(b)(1)(A). *See In re Dant & Russell, Inc.,* 853 F.2d 700, 707 (9th Cir.

1988). In general, we review findings of fact for clear error and conclusions of law *de novo. E.g., In re Comer,* 723 F.2d 737, 739 (9th Cir.1984).

## ISSUES PRESENTED

1. Whether Gull's cleanup costs performed on property not owned by the estate and relating to pre-petition damages are entitled to § 503(b)(1)(A) administrative expense status.

2. Whether the bankruptcy court erred as a matter of fact or law in granting Gull an unsecured claim for its cleanup costs.

## DISCUSSION

We construe § 503(b)(1)(A) strictly. *E.g., In re Catalina Spa & R.V. Resort, Ltd.,* 97 B.R. 13, 17 (Bankr.S.D.Cal.1989) (citing *Standard Oil Co. v. Kurtz,* 330 F.2d 178, 180 (8th Cir.1964)). The applicant must prove by a preponderance of the evidence entitlement to the administrative expense. *Id.* (citing *In re Patch Graphics,* 58 B.R. 743, 746 (Bankr. W.D.Wis.1986)).

Administrative status is allowed when a claim (1) is incurred postpetition, (2) directly and substantially benefits the estate, and (3) is an actual and necessary expense. *E.g., In re Great Northern Forest Prods., Inc.,* 135 B.R. 46, 60 (Bankr.W.D.Mich.1991). We affirm based on the first element and therefore do not address the other two.

### 1. Damages Caused Pre–Petition

Although the bankruptcy court's findings of fact and conclusions of law raise some questions, the court clearly found that the petroleum leaks on the Hanna property occurred pre-petition, and that neither Hanna nor Mitchell "added any significant new contamination to the Hanna land postpetition." *Findings* (4–7–92) at 2–7.

As noted above, the bankruptcy court also found:

---

1. Similar demands were made by the Oregon Department Of Environmental Quality ("ODEQ") before and after the filing of the bankruptcy petition.

2. Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. sections 101 to 1330.

Gull asserted and proved at trial that contaminated subsurface water continued to migrate to its land from the polluted Hanna land....

*Findings* (4–7–92) at 3. The apparent inconsistency in these findings is resolved through the court's citation to *In re Jensen,* 127 B.R. 27 (9th Cir. BAP 1991), *aff'd,* 995 F.2d 925 (9th Cir.1993).[3]

In *Jensen,* the BAP discussed when claims arise for purposes of dischargeability.[4] The BAP held that the estate's cost-recovery claim was dischargeable because it arose from the debtor's prepetition actions even though the state's right to recover did not arise until postpetition when it cleaned up the site. 127 B.R. at 33.

█ *Jensen* cites as authoritative *In re Chateaugay Corp.,* 112 B.R. 513 (S.D.N.Y. 1990), *aff'd,* 944 F.2d 997 (2d Cir.1991), for the proposition that a claim arises upon the actual or threatened release of hazardous waste by the debtor. Consequently, if a tort occurs prepetition, with the injury occurring postpetition, such claim is deemed to have arisen prepetition. *Jensen,* 127 B.R. at 33 (citing *Chateaugay,* 112 B.R. at 522). In other words, so long as a prepetition triggering event had occurred, the claim was dischargeable regardless of when the claim for relief was ripe for adjudication. *Chateaugay,* 112 B.R. at 522.

In the instant case the bankruptcy court identified the acts giving rise to the alleged liability as the petroleum spills from the underground storage tanks into the soil. The later leaching from the soil to the groundwa-ter required no activity by Mitchell, but was rather "passive." *See Findings* (4–7–92) at 5. Consequently, the bankruptcy court found that all environmental damage was deemed to have occurred pre-petition. *See id.* We agree.

The Ninth Circuit has held that "damages caused during the pre-petition period are not entitled to administrative expense priority." *Dant,* 853 F.2d at 709. *Dant* also held that "consequent damage" occurring postpetition should be regarded as having occurred pre-petition. *Id..*[5]

For all practical purposes, the instant appeal is equivalent to *Dant.* In *Dant,* a pre-petition debtor operated a wood treatment plant on land partially owned by the debtor and partially leased from the Burlington Northern Railroad Company. The wood treatment facility operated for over a decade and caused massive toxic waste contamination on both properties, including significant concentrations of PCP in the groundwater. The pre-petition debtor clearly caused the pollution to both properties.

Burlington Northern spent approximately $250,000 under a separate agreement with the EPA to clean up its property. Burlington requested that these cleanup costs be given administrative expense status, which request was denied for two reasons: (1) because the damages occurred pre-petition; and (2) because the remedial efforts occurred off-site on property not owned by the bankruptcy estate. *Dant,* 853 F.2d at 709. *See also Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). The *Dant* court

---

**3.** Mitchell argues that insufficient evidence was presented to determine that the Hanna release leached into the groundwater, and that the court made an impermissible presumption of causation. This is incorrect. The court heard testimony from AGI who believed that the groundwater contamination originated at the Hanna site. There was no contradictory evidence offered. The court is permitted to give weight to expert testimony. Fed.R.Evid. 702.

**4.** The *Jensen* analysis is not limited to dischargeability cases, but rather is also useful for purposes of determining administrative status. *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), relied on by the dissent, also deals with dischargeability issues.

**5.** *Jensen* and *Dant* are Ninth Circuit and BAP opinions interpreting the Bankruptcy Code. These opinions are not affected by the idiosyncracies of state law, such as O.R.S. § 465.255, which, according to the dissent, contradicts *Jensen* and *Dant.* We find no contradiction—*Dant* having applied Oregon law—but in the event of a disagreement between the Bankruptcy Code and the Oregon Code, the former must prevail. *See also* discussion, *infra* at 390. We do not disagree with the dissent's insistence that a trustee must comply with state environmental laws. If such laws have been violated, appropriate remedies are available outside of the bankruptcy context. However, the narrow issue before this panel is whether Gull's cleanup costs should be given administrative priority under the Bankruptcy Code.

reasoned, pursuant to § 503(b)(1)(A), that the off-site remediation had not been shown to be for "the actual, necessary costs and expenses of preserving the estate...." *Dant,* 853 F.2d at 709. Gull has cited no case wherein off-site cleanup costs were given administrative expense status.

In light of *Dant,* the bankruptcy court did not abuse its discretion in denying Gull administrative expense status for the continuing effects of pre-petition damages. *See e.g., In re Bill's Coal Co.,* 124 B.R. 827, 829–30 (D.Kan.1991).

### 2. *Policy Considerations*

■ Gull argues that its $130,000 claim should be allowed as an administrative expense as a matter of environmental protection policy. Gull's argument fails to recognize the conflicting authority articulated by the Ninth Circuit that "[a]lthough [the creditor] asserts that public policy considerations entitled its claims for cleanup costs to administrative expense priority, we acknowledge that Congress alone fixes priorities.... Courts are not free to formulate their own rules of super or sub-priorities within a specifically enumerated class." *Dant,* 853 F.2d at 709 (citations omitted); *see also Jensen,* 127 B.R. at 33.

*Dant,* a case dealing with Oregon law, concluded with the following statement:

> [A] State may protect its interests in the enforcement of its environmental laws by giving cleanup judgments the status of statutory liens or secured claims. But until the Oregon legislature enacts such protective provisions or until Congress amends sections 503 and 507 to give priority to claims for cleanup costs, we are without authority to create such a priority.

*Dant,* 853 F.2d at 709 (citations omitted). Consequently, we cannot grant the requested relief as a matter of policy.

### 3. *Cross–Appeal.*

■ Mitchell argues that Gull's claim should not be allowed because it failed to follow the guidelines issued by the ODEQ in its cleanup efforts, and that its efforts were not reasonable as required by the statute. Mitchell also disputes the court's alternative

theory of liability based on trespass. Because we affirm based on the former, we do not address the latter.

Mitchell asserts that Gull did not follow applicable rules governing remedial actions in containing the gasoline plume. Pursuant to O.R.S. § 465.200(15), Mitchell believes that, by definition, an allowable claim must be "consistent with a permanent remedial action." The court found that Gull's actions *could* be consistent, and the trustee asserts that therein lies the error.

However, the definition of remediation goes on to state that remediation includes actions "taken instead of or in addition to removal actions ... to minimize the release ... so that it does not migrate to cause substantial danger...." Because the court found that Gull's actions slowed the spread of the plume, it appears that its actions fit the statute. Although Gull's particular actions are not listed in the statute, the statute expressly states that the list is not exclusive. Nor does the statute require that an action be cost effective. Thus, even though the court was not convinced that the action was cost effective, it did not err in concluding that the action was remedial under the statute.

## CONCLUSION

The bankruptcy court found that the environmental damage caused to the Hanna site occurred prepetition, including the continuing effects of prepetition damages, and that cleanup costs relating to prepetition damages were not entitled to administrative expense priority. Gull has failed to show that these findings of fact and conclusions of law were erroneous. Gull has also failed to show that this panel should go beyond the facts and law relevant to this case based on policy considerations.

The bankruptcy court found that Gull's efforts were remedial and benefitted the public, and that Gull was therefore entitled to a general unsecured claim. Mitchell has failed to show that the bankruptcy court erred in these findings and conclusions.

Accordingly, we affirm the bankruptcy court's denial of administrative expense sta-

tus and its grant of a general unsecured claim to Gull.

VOLINN, Bankruptcy Judge, dissenting:

## BACKGROUND FACTS

The debtor, Daniel C. Hanna, and appellant Gull Industries operated filling stations on adjacent parcels of land in Gresham, Oregon. Prior to the bankruptcy, Gull sold its filling station to appellant BP Oil Company. In the contract, appellants (collectively referred to as Gull) allocated the cost of any environmental remediation of the site between themselves.

In August of 1989, approximately one year prior to Hanna's bankruptcy filing, Gull hired AGI, an environmental consultant, to inspect the site. AGI discovered one to three inches of free petroleum product on the surface of the groundwater some 18 feet beneath the site. It concluded that the petroleum contaminating the groundwater had originated uphill on Hanna's property to the east of the Gull site, migrating downhill into the Gull property. AGI also discovered soil contamination at the Gull site. It determined, however, that the material in this contaminated soil had not leached down to a level where it would contaminate the groundwater.[6]

In April 1990, the Oregon Department of Environmental Quality (the ODEQ) directed Hanna to perform a site assessment, but Hanna took no action. In June 1990, Gull began remediation on its own site by commencing installation of three large diameter recovery wells. On July 19, 1990, Gull demanded of Hanna that he clean up his site to stop the migration of contamination onto the Gull site. Hanna did not respond to the demand, and, on July 27, filed a petition under Chapter 11 of the Bankruptcy Code. A trustee was appointed on July 30, 1990.

## PROCEEDINGS AFTER BANKRUPTCY

After the bankruptcy petition was filed, Gull took substantial additional remedial ac-

tions. From August through October, it purchased, installed and operated a vapor extraction system to clean the contaminated groundwater and continued with operation of the previously installed recovery wells. On August 24, 1990 Gull filed an adversary complaint in Hanna's bankruptcy for an injunction and an administrative priority damage claim. On December 13, 1990, the trial court signed a stipulated order in the adversary proceeding issuing an injunction prohibiting the trustee from storing any new petroleum at its site and directing the trustee to comply with Oregon's hazardous waste statute, O.R.S. § 465.200 et seq.[7] The trustee emptied the Hanna underground storage tanks in October 1990 and removed them in April of 1991.[8] He did not, however, remove any of the existing contaminated soil that had been determined by AGI to be the source of the contamination on the groundwater under Gull's premises.

## THE COURT'S FINDINGS AND CONCLUSIONS

On April 7, 1991, the court signed an order denying Gull an administrative claim. The court found that Gull proved that contaminated subsurface water continued to migrate under Gull's site after the trustee's initial action. It found that Gull's cleanup efforts did not significantly contribute to reduction of contamination of the Hanna site, and therefore, that Gull did not prove that its efforts reduced the cost that the estate would incur to clean up its own property.

The court also found that the release from Hanna's underground storage tank occurred prepetition, and that the trustee acted reasonably in shutting down operations, even though he did not pursue cleanup of the resulting contamination. It found that the trustee as postpetition successor to the debtor was not reckless, negligent, nor strictly liable in his postpetition conduct and concluded that there was no postpetition trespass.

---

6. Gull removed this material, but the cost of doing so is not involved in its claim against the estate.

7. Relevant portions of the statute are quoted infra.

8. Both filling stations are presently closed. The Hanna property was transferred to another entity in accordance with the confirmed plan of reorganization in the debtor's Chapter 11.

Finally, it found that Gull was not specially damaged by the debtor's release of contaminant into the groundwater any more than the public at large, except for the effect of the contamination on the sale price of the property between Gull and BP.[9]

On October 29, 1992, the court entered supplemental findings of fact and conclusions of law. The court found that Gull's efforts cleaned the groundwater but did not eliminate the source. It found that Gull's costs were caused by Hanna, and Hanna was liable because Oregon's hazardous waste statute, O.R.S. § 465.200 *et seq.*, imposes strict liability. It concluded that Gull's efforts, which it performed on the advice of experts, were reasonable. The court also concluded that while Gull's efforts did not follow the DEQ's administrative rules, the efforts were reimbursable under the statute, although the court was not convinced that the actions were cost effective or permanent.

The court also held the debtor liable in the alternative for trespass because the contamination had affected the sale price of the property, although it found that the groundwater did not specially harm Gull any more than the public at large, since it did not use the groundwater at the site. The court allowed Gull a general unsecured claim for $129,420; of this, Gull's costs expended prepetition were some $47,452 while its postpetition expenditures amounted to $81,968. As indicated, Gull appealed the denial of first priority administrative status for its claim; the trustee cross-appealed imposition of liability for Gull's costs as an unsecured claim.

## ISSUE PRESENTED

The central issue presented by this appeal is whether a bankruptcy estate is subject to an administrative claim for off-site remediation costs resulting from failure to clean up polluting material on estate property which is a source of contamination of neighboring property. Gull argues that when the court denied administrative priority to Gull's claim, the court abused its discretion by failing to recognize that Gull's cleanup costs, although not expended in direct remediation on Hanna's site, benefitted the estate because postpetition, the estate was obligated to remediate off-site consequences of the release, including the effect on Gull's site.[10] On cross-appeal, the trustee claims that the trial court erred by awarding Gull an unsecured claim under the hazardous waste statute and the common law of trespass, and that the court's factual finding that the Hanna release contaminated the groundwater was clearly erroneous.

## DISCUSSION

### I

The facts in this case, with one significant distinction, are similar to facts considered by *In re Dant & Russell*, 853 F.2d 700 (9th Cir.1988).[11] In *Dant & Russell*, the debtor's lessor, Burlington Northern (BN), applied for administrative expense status for past and future cleanup costs caused by the debtor's prepetition activities when the debtor occupied the property. The court determined that 11 U.S.C. § 503(b), which allows administrative priority for "actual, necessary costs and expenses of preserving the estate" must be construed narrowly in order to preserve the estate for the benefit of all unsecured creditors. After determining that the debtor postpetition had no interest in the lessor's property, the court denied administrative priority to the lessor's claim. Here, the debtor's interest in the estate continued in his capacity as debtor in possession to whose interests the trustee has succeeded.

---

9. Although not stated by the court, this finding appears to relate to the viability of a nuisance claim—nuisance requires a showing of more than a lowering of the value of the property.

10. Gull also argues that its operation of the vapor extraction system is in fact remediating pollution at the Hanna site. Gull asserts that the system is extracting pollution from the groundwater under the Hanna site itself. The court made no finding in this respect.

11. *In re Jensen*, 995 F.2d 925 (9th Cir.1993) citing *Dant & Russell*, and cited by the majority, is inapposite. In *Jensen*, the issue was dischargeability, or postpetition liability of the debtor for its prepetition conduct: liability of the trustee or the estate for breach of a distinct postpetition duty was not at issue, as is the case here.

In the present case, the bankruptcy judge found that contaminants continue to leach from the polluted soil on the Hanna site postpetition. In *Dant & Russell,* "most, if not all," of the contamination on BN's land occurred prepetition. *In re Dant & Russell,* 67 B.R. 360, 364 (D.Or.1986). Moreover, there is no indication in any of the three *Dant & Russell* opinions [12] that the pollution on BN's land was caused by leaching from the debtor's adjoining property, either before or after filing of the bankruptcy.

In the instant case, the cause of the cleanup costs originated on property owned and controlled by the debtor in possession after the filing of the petition and until its ultimate turnover to another entity on plan confirmation. These circumstances differ significantly from those existing in *Dant & Russell,* where the debtor and the property were not involved with the bankruptcy estate.

## II

The United States Supreme Court has considered the interface of environmental and bankruptcy law in circumstances which provide guidance here. In *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the state had initiated action to collect from Kovacs the cost of pollution cleanup of debtor's property. The debtor's business was placed in state receivership. The Supreme Court determined that the state's attempt to collect from the individual debtor the cost of cleanup of the business was a claim dischargeable in bankruptcy. The claim was based on the debtor's failure to comply with a prepetition injunction to clean up hazardous waste. Because the receivership had already dispossessed the debtor from the property prior to his bankruptcy, the state's only remedy against him was for money damages, and the court therefore held that the remedy constituted a general unsecured claim for money against the debtor subject to discharge.

While the *Kovacs* court was presented with the liability of the individual debtor and not with the estate's postpetition liability, it nevertheless alluded to the postpetition liability of the current operator of the property (as is the case here where the trustee controlled the property prior to its turnover to another entity on confirmation of the plan). The court stated:

> Finally, we do not question that anyone in possession of the site—whether it is [the debtor] or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy trustee—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions.

*Id.* at 285, 105 S.Ct. at 711.[13]

Although the court declined to address the legal consequences which would have ensued had the debtor taken bankruptcy before appointment of the receiver, it nevertheless hypothesized that:

> If the property was worth more than the costs of bringing it into compliance with state law, the trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation [the debtor] might have had to clean up the property would have been satisfied. If the property were worth less than the cost of cleanup, the trustee would likely abandon it to its prior owner, who would have to comply with the state environmental law to the extent of his or its ability.

*Id.* at 284–85 n. 12, 105 S.Ct. at 710–11 n. 12.[14]

---

**12.** 61 B.R. 668 (Bankr.D.Or.1985); 67 B.R. 360 (D.Or.1986); 853 F.2d 700 (9th Cir.1988).

**13.** The foregoing language was adopted by *Matter of CMC Heartland Partners,* 966 F.2d 1143, 1147 (7th Cir.1992), which held that although the EPA's claim against the debtor for prepetition contamination had been time-barred by the EPA's failure to file a proof of claim, this would not bar an independent postpetition claim against the reorganized debtor based on its status as owner of contaminated land. *Accord, In re Torwico Electronics, Inc.,* 8 F.3d 146 (3rd Cir. 1993).

**14.** This hypothesis may have relevance here since the confirmed plan has transferred the property. However, the record does not indicate the present status of the Hanna property.

In a subsequent case, the Supreme Court restricted the trustee's right to abandon contaminated property, underscoring a trustee's liability as a property owner. *Midlantic Nat. Bank v. N.J. Dept. of E.P.*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). In *Midlantic,* the court determined that a bankruptcy trustee cannot abandon property that has negative value, basing its decision in part on 28 U.S.C. § 959(b), which imposes a duty on the trustee to manage and operate estate property in compliance with state law. While abandonment is not an issue presented here,[15] the basis for the *Midlantic* decision is pertinent. Since a trustee cannot abandon property to circumvent a statutory duty, *a fortiori,* a trustee occupying property which he does not wish to abandon should not disregard or abdicate his duty under state law.

The majority states that it relies on *In re Jensen, supra* herein, footnote 6, which "cited as authoritative," *In re Chateaugay Corp.,* 944 F.2d 997 (2nd Cir.1991). *Chateaugay,* which discussed in depth the nature of prepetition claims in bankruptcy in the particular context we are concerned with here, affirmed the trial court's ruling that post-petition remedial claims are to be accorded priority administrative status.[16]

Taken together, *Kovacs* and *Midlantic* impose legal obligations on a bankruptcy estate regardless of the dischargeability of the debtor's liability. To hold otherwise would not only allow a debtor to shift costs to the taxpaying public or innocent third parties, but would grant the debtor in possession or trustee immunity to laws enacted to protect the public safety.

### III

Although the majority is correct that the postpetition leaching is a consequential damage caused by the prepetition rupture of Hanna's underground storage tanks, Oregon's hazardous waste statute creates a present liability on the landowner for failure to abate it. The court found the debtor liable to Gull under O.R.S. § 465.255. The relevant portion of that statute states:

(1) The following persons shall be strictly liable for those remedial action costs incurred by the state or any other person that are attributable to or associated with a facility and for damages for injury to or destruction of any natural resources caused by a release:

(a) Any owner or operator at or during the time of the acts or omissions that resulted in the release.

---

**15.** The trial court stated that "Mitchell [the trustee] believes that the land is worth more than the clean-up."

**16.** *Chateaugay,* at page 1009, stated:

The Bankruptcy Code accords an administrative priority to "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A) (1988). The District Court ruled that all clean-up costs assessed postpetition with respect to sites currently owned by LTV where there has been a pre-petition release or threatened release of hazardous wastes will be entitled to administrative priority. LTV and the unsecured creditors challenge this ruling, viewing it as an unwarranted attempt to convert pre-petition contingent claims into priority claims by the simple expedient of liquidating them, i.e., incurring response costs and securing reimbursement. EPA contends that response costs paid during administration with respect to pre-petition releases or threatened releases are necessary to preserve the estate in the sense that they enable the estate to maintain itself in compliance with applica-

ble environmental laws. The Equity Holders urge that decision as to whether reimbursement for any response costs is entitled to administrative priority cannot be made until there has been a careful assessment of the facts peculiar to each payment.

The District Court drew support for its ruling from the Supreme Court's decision in *Midlantic,* which ruled that a bankruptcy trustee could not abandon property in contravention of state or local laws designed to protect public health or safety. If property on which toxic substances pose a significant hazard to public health cannot be abandoned, it must the [sic] follow, the Court reasoned, that expenses to remove the threat posed by such substances are necessary to preserve the estate. We agree, as have other courts considering the same issue. *See In re Wall Tube & Metal Products Co.,* 831 F.2d 118, 123–24 (6th Cir. 1987); *In re Peerless Plating Co.,* 70 B.R. 943, 948–49 (Bankr.W.D.Mich.1987); *In re Stevens,* 68 B.R. 774, 783 (D.Me.1987); *see also In re Smith–Douglass, Inc.,* 856 F.2d 12, 17 (4th Cir.1988).

O.R.S. § 465.255(a) (1993).[17]

The present owner of the property, in this case the trustee of the debtor in possession, cannot escape remediation obligations imposed by the law of the state by arguing that the debtor has been discharged from past and future obligations arising out of his prepetition conduct. *Matter of CMC Heartland Partners,* 966 F.2d 1143. Gull has a private right of action against any owner or operator of the property, not solely against the owner or operator whose conduct initially created the problem. The trustee is an owner or operator and consequently is burdened with strict liability for all costs related to present releases. The trustee is equally as liable under the statute as any other owner or operator would be. The issue before us is whether, under the circumstances, Gull has demonstrated that its off-site efforts are compensable under the statute.

### IV

In its April 7 Findings of Fact and Conclusions of Law, the trial court concluded, "The State of Oregon cannot create an administrative priority for bankruptcy purposes by enacting a statute that imposes strict liability for the claims of a neighbor arising from prepetition conduct of the debtor. *Dant & Russell,* 853 F.2d at 709." As noted above, reliance on *Dant & Russell* is misplaced because here the claim is based on liability arising from the trustee's knowing failure to observe a duty imposed on him by the Oregon statute with respect to property owned by the estate. Clearly, the State of Oregon can impose liabilities based on property ownership that extend to a bankruptcy trustee. *See California State Board of Equalization v. Sierra Summit, Inc.,* 490 U.S. 844, 853–54, 109 S.Ct. 2228, 2235, 104 L.Ed.2d 910 (1989):

"[b]y the transfer to the trustee no mysterious or peculiar ownership or qualities are given to the property," and that "there is nothing in that to withdraw it from the necessity of protection by the State and municipality, or which should exempt it

from its obligations to either." (quoting *Swarts v. Hammer,* 194 U.S. 441, 444 [24 S.Ct. 695, 696, 48 L.Ed. 1060] (1904)).

O.R.S. § 465.200(14) (1993) defines release as:

"[A]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, *escaping, leaching,* dumping or disposing into the environment...." (emphasis added).

While the court found correctly that the trustee's passive failure to remove the soil was not culpable as trespass, it did not address the trustee's postbankruptcy conduct under § 465.255(1)(d) which imposes strict liability for omissions. An omission is "the neglect to perform what the law requires. The intentional or unintentional failure to act to act...." *Black's Law Dictionary* (6th ed. 1990).

As quoted above, the definition of release in O.R.S. § 465.200(14) which includes "escaping and leaching" imposes liability for non-action as well; a party does not *act* in regard to escaping or leaching, but rather fails to act to abate it, thereby permitting the escaping or leaching to occur. The statute therefore imposes a duty on the owner of a facility to remove the source of the leaching. The trustee's failure to clean up the soil permitted or resulted in a leaching type of release, which ultimately took the form of a migratory and invasive "plume" as the trial court described it.

As indicated, the trustee failed to act not only in derogation of a statutory duty to remove the soil, but in the face of a court order to do so. Until soil removal is accomplished, the statute imposes strict liability on the trustee for the efforts of the state or any other person who engages in remedial action, such as Gull, whose actions are currently retarding the plume of gasoline in the groundwater. This duty must be promptly performed since migratory pollution, as indicated in the record here, would proceed inex-

---

**17.** Subsection (b) of § 465.255 imposes strict liability on: "(b) Any owner or operator who became the owner or operator *after the time of the acts or omissions* that resulted in the release, and who knew or reasonably should have known of

the release when the person first became the owner or operator." (emphasis added). This subsection may impose successor liability on a bankruptcy trustee for *all* remediation costs, whether incurred prepetition or postpetition.

orably without preventive action. The purpose of environmental statutes is to encourage expeditious treatment of the problem so as to forestall further damage.

Oregon's hazardous waste statute is drafted broadly to effect such prompt preventive action and imposes liability on a property owner for the cost of preventive off-site remediation. Consequently, Gull's appropriate off-site response gives rise to a cause of action thereunder. "Remedial action" is defined in O.R.S. § 465.200(15) (1993) to mean:

"[T]hose actions consistent with a permanent remedial action taken instead of or *in addition to* removal actions in the event of a release or threatened release of a hazardous substance into the environment, *to prevent or minimize the release of a hazardous substance so that it does not migrate* to cause substantial danger to present or future public health, safety, welfare or the environment." (emphasis supplied).

On the date of the filing of the petition, Hanna's estate received the contaminated property along with all concomitant obligations to manage it as the law required and liability for failure to do so. Liability of the trustee as the owner of the property therefore is predicated on the continuous release of contaminants in the remaining soil that the court found continues to leach into the groundwater and downhill. It is clear from the court's findings of fact that, at the date of the filing of the petition, gasoline was leaching out of the contaminated soil on the Hanna site into the groundwater and that Gull was containing its spread. The court's statements, taken variously from its April 7 and October 29 findings state:

The ground under the [Hanna] tanks was seriously contaminated by gasoline.

*Findings of Fact and Conclusions of Law* at 3 (April 7, 1992).

Gull asserted and proved at trial that contaminated subsurface water continued to

migrate to its land from the polluted Hanna land.

*Id.*

[The plaintiffs' efforts] are slowing the plume of contamination which is emanating from the Hanna site.

*Findings of Fact and Conclusions of Law* at 5 (October 29, 1992).

Although the action by plaintiffs did not eliminate the source of the petroleum, which is the soil on the Hanna site, they reduced the amount of pollutant in the groundwater. In this sense, their action benefitted the public.

*Id.* at 2.

Thus, it appears clear from the court's findings that there has been a release of gasoline from the property, originating prepetition, that has continued postpetition and will continue until the source of the release is removed.[18]

### CONCLUSION

The bankruptcy court's conclusion that Gull is not entitled to administrative status for its postpetition costs is an error of law. Even though the debtor initially created the harm, the trustee's succession to ownership of the property was attended by a responsibility to abate the ongoing downhill release of contaminant under Oregon law. This responsibility did not stop at his property line. Gull is entitled to first priority administrative expense status for its postpetition costs associated with remediation of the ongoing release from the contaminated soil. That part of the order denying administrative status for postpetition costs should be reversed. I therefore respectfully dissent.

---

**18.** The court also found that there has been no significant postpetition contamination. In view of the statements quoted above, this finding reflects the court's understanding that postpetition liability against the estate could be predicated only on postpetition releases from the removed ruptured storage tanks.