**In re Antonio H. AZEVEDO, Debtor.**

**No. 11–41561–JDP.**

United States Bankruptcy Court, D. Idaho.

Jan. 22, 2013.

See also 2012 WL 3726752.

David Gadd, Worst, Fitzgerald & Stover, PLLC., Twin Falls, ID, for Standlee Hay Co.

Daniel Green and Brett R. Cahoon, Racine, Olson, Nye, Budge & Bailey, Chartered, Pocatello, ID, for Gary Rainsdon Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### *Introduction*

Debtor Antonio Helio Azevedo ("Debtor"), a dairy farmer, purchased livestock feed products from vendor Standlee Hay Company, Inc. ("Creditor") during the pendency of Debtor's chapter 12[1] case. To determine the status and priority of Creditor's unpaid claim for some of those purchases in the bankruptcy case, now a liquidating chapter 7 case, the Court must decide, as a matter of fact, whether the subject transactions occurred in the ordinary course of business for purposes of § 364(a), and thus qualify as an administrative expense under § 503(b). While Creditor contends in its application to the Court that its claim against Debtor qualifies for administrative expense status, Dkt. No. 151, the chapter 7 trustee Gary Rainsdon ("Trustee") objected. Dkt. No. 158.

On November 27, 2012, the parties appeared and presented evidence on this question of fact.[2] Thereafter, the parties filed briefs. Dkt. Nos. 347, 354, and 357. Having considered the record, evidence and testimony, and the arguments of the parties, for the following reasons, Creditor's application for allowance of administrative expense should be granted.

### *Facts* [3]

Debtor filed a chapter 12 petition on September 20, 2011. Dkt. No. 1. Debtor

---

**1.** Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

**2.** In a Memorandum of Decision entered August 27, 2012, the Court held that a unresolved question of fact existed as to whether the transactions between Creditor and Debtor were in the ordinary course of business for

purposes of § 364(a). Dkt. No. 234. The Court directed that an evidentiary hearing be scheduled to resolve this issue.

**3.** The Court set forth the relevant background and procedural history of this contest in its prior Memorandum. *See* Dkt. No. 234 at 2–5. The facts recited here constitute the Court's findings of fact as determined from the testimony and evidence presented at the hearing. Rules 7052 and 9014.

continued to operate his business for some time while unsuccessfully attempting to reorganize his financial affairs. The case was converted to chapter 7 at Debtor's request on May 11, 2012. Dkt. No. 133.

Creditor asserts it is entitled to an administrative expense claim in the bankruptcy case in the amount of $463,363.07. The debt arose as the result of Creditor's sales of feed products to Debtor on credit from January 6, 2012, through May 2, 2012.

At the hearing, Creditor's president, Dusty Standlee testified that Creditor is a feed broker that locates and buys hay and other feed products from producers, and then sells those goods to farmers. Mr. Standlee testified that Debtor had been a long-time customer who usually paid for purchases according to invoice terms, which required payment from customers within 30 days of delivery of the products. However, he testified, since about 2009, the dairy industry has suffered from severe economic strains, and consequently, many of Creditor's customers began paying later than the normal 30 days. Since then, and even now, Mr. Standlee explained, it is commonplace for Creditor's customers to pay their accounts 60 to 90 days after delivery, or even later.

Mr. Standlee's testimony was supported by Creditor's documentary exhibits entitled "Accounts Receivable Aged Invoice Report" containing information on all of Creditor's credit accounts for 2011 and most of 2012. Creditor's Exhs. 101, 102.[4] These reports show several of Creditor's significant dairy customers in the Magic Valley of Idaho carried balances on their accounts with Creditor during the time period near Debtor's bankruptcy date with balances outstanding at least 30 days, with some up to 120 days old. *See* Creditor's Exh. 101 at 101-27 –101-30; Exh. 102 at 102-1–102-3.

Chancey Standlee, Creditor's salesperson, also testified extensively at the hearing concerning the accounts receivable records. His testimony highlighted several customer accounts receivable with outstanding balances of more than 30 days. He testified that, based on his experience, as winter approaches and sets in, dairy customers typically take longer to pay their accounts. Both of the Standlee's also testified that, on behalf of Creditor, they often "worked with" dairies that had not paid their accounts current within the 30-day invoice mark in order to help the farmers, to retain them as a customers, and to insure continued payments to Creditor.

Creditor also offered the testimony of Rick Onaindia, a feed procurement officer for a large dairy operation known as Bettencourt Dairies. Prior to joining Bettencourt, Mr. Onaindia had worked in commercial lending for 22 years, primarily focused on dairy operations. He testified that, in his opinion, since 2009, dairies have had to pay for the livestock feed on "alternative payment schedules." Mr. Onaindia explained that this practice frequently involves payment for feed beyond the 30-day invoice period. He stated that it is now common for dairies to pay for their feed purchases 90 to 120 days from delivery.

Trustee's objection to Creditor's position is two-fold, focusing on both the vertical and horizontal dimensions tests for determining whether transactions constitute the

---

4. Trustee also admitted a similar document into evidence, Creditor's "Accounts Receivable Aged Invoice Report," which contains information about accounts but spanning a longer period of time. Trustee's Exh. 205.

ordinary course of business.[5]

First, in relation to the vertical dimensions test, he argues that Creditor provided excessive amounts of feed to Debtor on credit during the bankruptcy case, and thus their dealings were not in the ordinary course of business. Trustee points out that prior to Debtor's bankruptcy filing, from April through September, 2011, Debtor's maximum balance due to Creditor for purchases was $93,008.08, and that the largest purchase of feed by Debtor was $35,335. In contrast, Trustee notes that, after the petition date, Creditor allowed Debtor's account to balloon to a high of $463,363.07, while at the same time continuing deliveries to Debtor.

Trustee argues that Debtor's post-bankruptcy lag in payment to Creditor shows that these transactions were not in the ordinary course of Debtor's business. To support this, at the hearing, Trustee testified about his observations concerning Debtor's change in his payment habits after filing for chapter 12 relief. Through reference to the documentary exhibits, Trustee pointed out that, prepetition, Debtor generally paid its invoices, on average, within about 25 days of receipt of deliveries. However, after bankruptcy, Debtor, on average, did not pay Creditor until about 82 days after receipt.

As to the "horizontal dimensions" test, Trustee points out that the testimony of Mr. Onaindia did not sufficiently establish that Debtor's feed payment practices as to Creditor fell within those common in the dairy industry. In particular, Trustee suggests the witness's opinions are unreliable because Mr. Onaindia is familiar solely with larger dairy operations, not a smaller ones like that of Debtor.

*Analysis and Disposition*

A. *Section 503(b)(1)(A)'s "Actual and Necessary" Tests*

■ Under the Bankruptcy Code, the administrative expenses of a bankruptcy case are those claims incurred for "the actual, necessary costs and expenses of preserving the estate." § 503(b)(1)(A). Administrative expenses allowed under § 503(b) enjoy a high priority of payment in bankruptcy cases. § 507(a)(2) (providing priority for administrative expenses subordinate only to domestic support obligations and trustee expenses). The Supreme Court instructs that the costs for "preservation of the estate" include those incurred for the continuation of the business of the estate. *Reading Co. v. Brown*, 391 U.S. 471, 475, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). By assuring claimants priority of payment, § 503(b)(1)(A) therefore serves an important purpose, in that it provides an incentive to vendors and suppliers of necessary goods and services to continue to deal with a debtor in bankruptcy to continue its business and thus benefit the estate and all its creditors. 4 COLLIER ON BANKRUPTCY, ¶ 503.06[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

■ Bankruptcy courts apply a two-part test to determine whether a claim represents an "actual and necessary expense" and thus should be allowed as an administrative expense for purposes of § 503(b)(1)(A). *Id.* at [3]. To make this decision, the court must determine: (1) whether the expense arose from a transaction with the estate; and (2) whether the transaction directly and substantially benefitted the estate. *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir.1998); *Microsoft Corp. v. DAK Industries, Inc. (In re DAK Indus-*

---

**5.** *See* Memorandum of Decision, Dkt. No. 234 at 8 –10. These tests are discussed in detail below.

tries, Inc.), 66 F.3d 1091, 1094 (9th Cir. 1995); *Hopkins v. Idaho State University Credit Union, et al. (In re Herter)*, 464 B.R. 22, 32 (Bankr.D.Idaho 2011). The creditor bears the burden of proving its claim is entitled to allowance as an administrative expense. *In re DAK Industries, Inc.*, 66 F.3d at 1094. While the bankruptcy court has broad discretion in making this determination, it should narrowly construe this test for allowance of an administrative expense. *Id.*

### B. Section 364(a) and the Ordinary Course of Business

■■■■■ Section 364(a) provides that "[i]f the [debtor] is authorized to operate the business of the debtor under section … 1203 … the [debtor] may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense." In other words, if a party supplies goods on credit to a debtor operating a business in a bankruptcy case, and if the transaction was "in the ordinary course of business," the debt arising from that transaction may be allowed as an administrative expense. If the debt incurred or credit obtained by the debtor did not occur in the ordinary course of business, it is not automatically recognized as an administrative expense.[6]

■■■■■ Two tests have been employed by the Ninth Circuit in determining whether a transaction is in the ordinary course. *See Aalfs v. Wirum (In re Straightline Investments, Inc.)*, 525 F.3d 870, 879 (9th

Cir.2008); *Burlington Northern R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 (9th Cir. 1988); *Crawforth v. Wheeler (In re Wheeler)*, 444 B.R. 598, 612 (Bankr.D.Idaho 2011). Generally, both tests must be satisfied for a transaction to qualify as ordinary course. *In re Straightline Investments, Inc.*, 525 F.3d at 879.

#### i. The Vertical Dimensions Test

■■■■■ The first test is the "vertical dimensions, or creditor's expectation, test." *Id.* This test weighs the subject transaction from the point of view of a hypothetical creditor, asking whether the deal with the debtor "subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *In re Dant & Russell, Inc.*, 853 F.2d at 705. In applying this test, courts compare the debtor's prepetition business practices to its post-bankruptcy practices. *In re Straightline Investments, Inc.*, 525 F.3d at 879. But "changes between prepetition and postpetition business activity alone are not per se evidence of extraordinariness." *The Comm. of Asbestos–Related Litigants and/or Creditors v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 60 B.R. 612, 617 (Bankr.S.D.N.Y. 1986). In applying this test one court observed that "some transactions either by their size, nature or both are not within the day-to-day operations of a business and therefore extraordinary." *Johnston v. First Street Companies (In re Waterfront Companies, Inc.)*, 56 B.R. 31, 35 (Bankr. D.Minn.1985). The primary focus under

---

**6.** Of course, a supplier and a debtor need not speculate about whether a contemplated transaction will qualify as an allowed administrative expense. In advance of doing the deal, they may ask the Court, after notice to the parties in the bankruptcy case and a hearing, to bless the transaction under § 364(b) (providing that the court may authorize a debtor to incur unsecured debt "other than

under subsection (a)" allowable under § 503(b)(1) as an administrative expense). This contest serves as strong evidence for the wisdom and business prudence of such approach. Whether out of ignorance, neglect, or unknown business considerations, Creditor did not take advantage of the Code's fail-safe procedure to protect its rights.

the vertical dimensions test is the types of transactions a debtor is reasonably likely to enter into in the course of its business. *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y.1983).

### ii. The Horizontal Dimensions Test

█ The other test used to determine the "ordinariness" of a transaction is the "horizontal dimensions test." *Straightline Investments, Inc.*, 525 F.3d at 880–81. This test looks at similarly-situated businesses and determines whether the transaction is one in which those other businesses would be involved. *Id.* at 881. The test gauges whether either the creditor or debtor did something to "gain an advantage over the other creditors." *Id.* (quoting *In re Dant & Russell, Inc.*, 853 F.2d at 704).

In *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143 (9th Cir. BAP 1988), the Bankruptcy Appellate Panel of the Ninth Circuit addressed both of the ordinary course of business tests employed under § 364(a) in a case with facts similar to those here. In *Blumer*, the supplier-creditor, sold the chapter 11 debtor, a road construction contractor, asphalt on credit for its use in completing a job obtained postpetition. *Id.* at 144. The debtor paid some of the creditor's invoices, but a significant amount remained due when the debtor's case was converted to chapter 7. *Id.* The creditor then applied to the bankruptcy court for allowance of an administrative expense for the balance due pursuant to § 503(b). *Id.* The bankruptcy court held that under both the horizontal or vertical dimensions tests, the debtor acted in the ordinary course of business in the asphalt transactions. In affirming the bankruptcy court's decision, the BAP noted that, in purchasing the asphalt on credit, "debtor did not subject his creditors to unexpected economic risks. Similarly, it is a reason-able assumption that other road builders would obtain asphalt on credit in the ordinary course of their businesses." *Id.* at 148.

### C. Disposition

█ The Court concludes that Creditor has adequately demonstrated through its proof that the balance due from Debtor for the feed purchases constitute "actual and necessary" expense of preserving the estate for purposes of § 503(b)(1)(A).

As explained above, in order to meet this test Creditor was required to show that its transactions with Debtor were: (1) with the bankruptcy estate; and (2) directly and substantially benefitted the estate. Here, Debtor commenced the bankruptcy case in September 2011, and the disputed transactions occurred between January and May 2012. It is therefore clear that all of the transactions were between Creditor and Debtor acting on behalf of the bankruptcy estate, satisfying the first prong of the test. The Court also concludes that, in supplying the estate feed needed for Debtor's livestock directly and substantially benefitted the estate, meeting the second prong of the above mentioned test. Clearly, feed is a required supply for the operation of a dairy. Simply put, a dairy-debtor's income is derived from milk sale proceeds; milk is product of the dairy's livestock; and without feed, the animals can not produce the milk. It is therefore hardly a stretch for the Court to find that the feed Debtor purchased from Creditor for his livestock directly and substantially benefitted the bankruptcy estate.

But were the transactions between Debtor and Creditor in the ordinary course of business under § 364(a)? The Court concludes that when measured by both the vertical and horizontal dimensions tests, they were.

As explained above in applying the vertical dimensions test, the Court must review

the challenged transactions from the perspective of a "hypothetical creditor" to determine whether they would subject that creditor to economic risks different than those it accepted when it decided to extend credit. *In re Straightline Investments, Inc.*, 525 F.3d at 879. In doing so, the Court looks to Debtor's prepetition practices, and compares them with his postpetition practices. *Id.* at 879–80.

Debtor routinely entered into credit transactions for the purchase of feed for its livestock both pre- and postpetition for similar amounts. Trustee does not dispute this:

> [Creditor] states that the Trustee's objection is based upon the fact that the 'Debtor purchased more hay and haylage from [Creditor] post-petition than it did pre-petition.' However, this is not the basis for the Trustee's objection. The Trustee's concern is with the amount of feed that [Creditor] sold to the Debtor *on credit,* and the fact that [Creditor] continued to deliver increased amounts of feed notwithstanding the fact that the Debtor became extremely *delinquent* with respect to its accounts payable to Creditor.

Trustee's Closing Argument, Dkt. No. 354 at 7 (emphasis in original). In other words, Trustee does not take issue with the "size" of Debtor's transactions with Creditor, but targets the "nature" of the transactions.

The Court concludes that whether Debtor purchased the feed for cash paid on delivery, or took advantage of the credit terms offered by Creditor, it would make no difference to a hypothetical creditor in this instance. Put another way, whether a creditor were paid immediately, or later in Debtor's business cycle would not subject that hypothetical creditor to any extraordinary risk. Debtor must earmark a portion of his milk income to pay to feed his animals in order to continue to operate his business. The nominal amount of interest charges and late fees claimed by Creditor here support this conclusion.[7] Further, the nature of the transactions with Creditor extending credit to Debtor, a long-time customer, for a longer period of time postpetition, considering the state of the market after 2009 as testified to by Dusty Standlee, Chancey Standlee, and Rick Onaindia, is not extraordinary. Therefore, the Court concludes that Creditor has shown that these transactions were in the ordinary course of business pursuant to the vertical dimensions test.

With respect to the horizontal dimensions test, the Court considers and compares the practices of similarly-situated businesses to determine whether the subject transactions are typical in a particular industry. Both parties submitted documentation about Creditor's accounts receivable during the relevant times, and in particular, the age of those accounts. In examining these reports, it becomes clear that Debtor's transaction amounts and terms are consistent with those involving Creditor's other dairy customers. With respect to the time elapsing between delivery of product and customer payment, it is obvious that Creditor has had several accounts that have significantly exceeded the optimal 30–day payment window specified in its invoices. Further, the Court finds the testimony of Mr. Onaindia credible and persuasive as to the feed and credit practices of other dairy operations, and concerning the longer periods of time generally needed by these operators to pay feed invoices after the downturn in the dairy market, starting in 2009. Therefore, the

---

**7.** Creditor is seeking $8,104.13 in interest and late charges as a part of their $463,363.07 claim.

Court concludes that Creditor has shown that its credit transactions with Debtor postpetition satisfy the horizontal dimensions test.

As it was in *In re Blumer*, it could be reasonably expected that Debtor would enter into the transactions with Creditor to acquire feed on a credit basis. The terms granted to Debtor by Creditor were not extraordinary in the light of the evidence provided to this Court. Because Creditor has shown that its postpetition transactions with Debtor occurred in the ordinary course of business, Creditor's claim for unpaid livestock feed purchases in the amount of $463,363.07 should be allowed as an administrative expense in this case.

### Conclusion

Creditor's application for allowance of an administrative expense will be granted in a separate order.